[Cite as *State v. Ross*, 2012-Ohio-536.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF LORAIN | ) | |

| | | |
|---|---|---|
| STATE OF OHIO | | C.A. No.    09CA009742 |
| Appellee | | |
| v. | | APPEAL FROM JUDGMENT ENTERED IN THE |
| MICHAEL ROSS | | COURT OF COMMON PLEAS COUNTY OF LORAIN, OHIO |
| Appellant | | CASE Nos.    05CR069222 06CR072432 |

DECISION AND JOURNAL ENTRY

Dated: February 13, 2012

WHITMORE, Judge.

{¶1}    Defendant-Appellant, Michael Ross, appeals from his convictions in the Lorain County Court of Common Pleas.  This Court affirms in part and reverses in part.

I

{¶2}    Ross met Larry Jones in 1995 after an unsuccessful bid for Lorain County Commissioner.  The two formed a friendship, and Jones helped Ross raise funds for another election bid in 1997.  According to Jones, Ross assured him that his company, Erie Shores Computer, Inc. ("Erie Shores"), would be able to participate in county business after Ross won the election.  Jones previously had worked with the county after he started Erie Shores in 1983, but did not have success in obtaining county contracts between 1987 and 1997.  Jones indicated that he settled a lawsuit against the county in 1987 and felt that he lost county business as a result.  Ross shared the sentiment that the county had mistreated Jones and hoped to rectify the

mistreatment if he became a commissioner. Ross won a seat as Lorain County Commissioner and began his term on January 3, 1997.

{¶3} In 1998, Ross told Jones about a new county project, involving the construction of a new courthouse ("the Justice Center"). Ross put Jones in contact with Warren Finkel, a local architect. Ross identified Finkel as the "contact person" and "go-between" for information about the Justice Center. He further indicated that Finkel would work with Jones to help him join up with the architectural and construction management teams that would be used for the Justice Center project. Although Jones informed Ross that Erie Shores did not have the resources to handle a project of that size, Ross assured him that it would be a way for Jones to recoup the county business Jones had lost in previous years. Ross stated that Erie Shores would still have "a role to play" even if it was not able to perform the technological work required for the project. Jones later testified that it was "understood" that Ross would receive some of the funds Erie Shores obtained from the project. According to Jones, Ross specified that he expected to receive approximately six percent of the costs of the Justice Center.

{¶4} Over the next several months, Ross, Jones, and Finkel spoke with each other about the Justice Center and the status of that project. Per Ross' instruction, the three never met as a group, but frequently exchanged information. In essence, Ross would feed Finkel information in advance about the top bid selections for the project, and Finkel would contact the bidders. Finkel informed both the top architectural firm choice, Collins, Gordon & Bostwick, and the top construction management firm choice, R.P. Carbone Co., that they were the frontrunners for the project, but that they needed to add Erie Shores to their respective teams to solidify their positions. Erie Shores ultimately signed independent contractor agreements with both firms. In each instance, the day after the firms signed their agreements with Erie Shores,

they were ranked as the top bid choice by way of a resolution. In each instance, Ross led the vote to adopt the resolution, and the two other county commissioners joined in his motion.

{¶5} Between November 1999 and December 2000, Ross also moved to adopt numerous resolutions approving additional business transactions between the county and Erie Shores. While most of the resolutions dealt with Erie Shores performing computer services for the county, one particular resolution involved the purchase of a building at 25 East Avenue. The county commissioners agreed to purchase the building from Erie Shores for $400,000 on November 30, 2000. Jones, through Erie Shores, had signed a purchase agreement for 25 East Avenue a few months before the sale to the county. He completed the purchase transaction the day after the commissioners passed the resolution to buy the property. Jones purchased the property for $250,000 before selling it to the county for $400,000.

{¶6} From May 1999 to December 2001, Jones wrote Ross over $500,000 worth of checks from either his personal account or his Erie Shores account. Ross, who also was an attorney, placed two of the checks in his IOLTA account. He deposited the remaining checks in a business account he opened on January 28, 2000, for MarketShape CD Manufacturing ("MarketShape").[1] Jones never hired Ross as his attorney or purchased anything substantial from MarketShape during the time period he wrote the checks to Ross. Jones indicated that he paid Ross his cut of the money from the Justice Center project as well as from the sale of the 25 East Avenue property through MarketShape.

---

[1] Ross purportedly formed MarketShape to produce custom-made CDs of various shapes for clientele interested in offering a distinct design for their particular business.

{¶7}    Ross lost his reelection bid in 2000 and finished his term as a commissioner on December 31, 2000.  Even after Ross left office, Jones continued to write him checks for monies owed on the Justice Center project.  Jones eventually pleaded guilty to numerous offenses related to the foregoing activities, as did Randall Gordon from Collins, Gordon & Bostwick (the architectural firm for the Justice Center project) and Vincent Carbone from R.P. Carbone Co. (the construction management firm for the Justice Center project).  Finkel was never convicted, as he died at some undetermined point before the trial in this matter.

{¶8}    In November 2005 and December 2006, Ross was indicted on forty-two separate counts in Case No. 05CR069222 and 06CR072432, respectively.  On November 6, 2009, the trial court consolidated the two cases under Case No. 05CR069222.  Further, the State voluntarily dismissed ten counts, and the trial court severed ten counts, reserving them for trial at later date.  The following twenty-two counts remained for trial: (1) two counts of engaging in a pattern of corrupt activity, in violation of R.C. 2923.32(A)(1); (2) two counts of conspiracy, in violation of R.C. 2923.01(A)(1); (3) four counts of money laundering, in violation of R.C. 1315.55(A)(1), (A)(2), (A)(3), and (A)(4), respectively; (4) three counts of bribery, in violation of R.C. 2921.02(B); (5) eight counts of having an unlawful interest in a public contract, in violation of R.C. 2921.42(A)(1); and (5) three counts of failing to file a tax return, in violation of R.C. 5747.19.

{¶9}    A jury trial began on November 9, 2009.  The following three additional counts were dismissed before deliberations: (1) one count of unlawful interest in a public contract; and (2) two counts of incomplete, false, and fraudulent returns prohibited.  The jury found Ross guilty on the remaining nineteen counts.  The trial court merged the two counts for engaging in a

pattern of corrupt activity, but sentenced Ross on all of the other counts. Ross received a total of nine and one-half years in prison.

{¶10} Ross now appeals from his convictions and raises ten assignments of error for our review. For ease of analysis, we consolidate and rearrange several of the assignments of error.

II

Assignment of Error Number Three

THE TRIAL COURT ERRED IN DENYING MR. ROSS'S MOTION TO DISMISS BASED ON PREJUDICIAL PRE-TRIAL DELAY.

{¶11} In his third assignment of error, Ross argues that the trial court abused its discretion by refusing to dismiss his indictment on the basis of prejudicial, pretrial delay. We disagree.

{¶12} Generally, this Court reviews a ruling on a pretrial motion to dismiss criminal charges under a de novo standard of review. *State v. Saxon*, 9th Dist. No. 09CA009560, 2009-Ohio-6905, ¶ 5. Yet, it is within a trial court's discretion to deny a pretrial motion to dismiss an indictment on the basis that the motion is untimely. *State v. Dunning*, 9th Dist. No. 06CA0087-M, 2007-Ohio-7039, ¶ 5-6. Crim.R. 12 limits the time within which a defendant may file a motion to dismiss based on defects in the indictment, but a trial court may allow an untimely motion "for good cause shown." Crim.R. 12(D), (H). *Accord State v. Passon*, 2d Dist. No. 90CA44, 1992 WL 235730, *3 (Sept. 18, 1992). That decision is then reviewed under an abuse of discretion standard of review. *Dunning* at ¶ 5-6. An abuse of discretion implies an attitude on the part of the trial court that is unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219 (1983).

{¶13} The crimes at issue in this appeal, for which Ross was indicted in November 2005 and December 2006, took place between 1997 and 2002. Ross filed his motion to dismiss on the

basis that the three- and four-year gaps between 2002 and his indictments in 2005 and 2006 caused him actual prejudice. He did not file his motion to dismiss, however, until Friday, November 6, 2009, three days before his Monday, November 9, 2009 trial date. The trial court orally denied the motion to dismiss on the morning of trial, based upon the State's response that the motion was untimely. Ross argues that the trial court abused its discretion in denying his motion because it set forth grounds sufficient to satisfy the two-prong test for unreasonable pre-indictment delay set forth in *State v. Luck*, 15 Ohio St.3d 150 (1984).

**{¶14}** Crim.R. 12(D) provides that pretrial motions to dismiss based on defects in an indictment must be filed "within thirty-five days after arraignment or seven days before trial, whichever is earlier." Ross had his last arraignment hearing in December 2006,[2] but did not file his motion to dismiss until November 2009. Accordingly, he waited almost three years to file it. Although Ross' first attorney withdrew from representation, the attorney who represented him for the remainder of the case appeared on his behalf in December 2006. Ross' attorney did not offer any justification for the delay in filing the motion to dismiss, other than the fact that he was not Ross' original attorney. Given the substantial length of time that elapsed between the arraignment and the filing of the motion and the fact that Ross had counsel during that period of time, the trial court denied the motion to dismiss on the basis of timeliness.

**{¶15}** On appeal, Ross once again argues that his motion to dismiss satisfied the test set forth in *Luck*. He concedes that his motion was untimely, but argues that the court abused its discretion by not allowing the motion "for good cause shown"; namely, the persuasiveness of his motion on the merits. Crim.R. 12(H). The trial court need not have reached the merits of his

---

[2] Ross previously was arraigned on the 2005 indictment and supplement to the 2005 indictment in November 2005 and April 2006.

motion, however, if the motion was not properly before it. Ross never sought leave to file his motion or offered any explanation for the delay in filing it, other than the replacement of his original attorney several years earlier. *See State v. Pelsozy*, 9th Dist. No. 23297, 2007-Ohio-148, ¶ 6-7. He also does not offer any argument or legal authority standing for the proposition that a court abuses its discretion by refusing to allow a motion to dismiss filed almost three years late and on the eve of trial. *See* App.R. 16(A)(7). Ross has not demonstrated that the court's denial of his motion on the basis of timeliness amounted to an abuse of discretion. Consequently, his third assignment of error is overruled.

Assignment of Error Number One

COUNTS ONE AND TWO OF THE INDICTMENT ARE INSUFFICIENT TO CHARGE THE OFFENSE OF ENGAGING IN A PATTERN OF CORRUPT ACTIVITY, BECAUSE EACH FAILS TO SET FORTH THE ACTS WHICH ARE ALLEGED TO CONSTITUTE THE PATTERN OF CORRUPT ACTIVITY.

{¶16} In his first assignment of error, Ross argues that his indictment was defective because it did not sufficiently charge the offense of engaging in a pattern of corrupt activity. Specifically, he argues that the indictment failed to set forth the predicate offenses or specific acts underlying that charge. We disagree.

{¶17} Ross did not object to his indictment on the basis of the defect he now alleges. "By failing to timely object to a defect in an indictment, a defendant waives all but plain error on appeal." *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, paragraph three of the syllabus. "Crim.R. 52(B) permits a reviewing court to take notice of '[p]lain errors or defects affecting substantial rights' even if a party forfeits an error by failing to object to the error at trial." *State v. Hardges*, 9th Dist. No. 24175, 2008-Ohio-5567, ¶ 9, quoting Crim.R. 52(B).

> First, there must be an error, i.e., a deviation from the legal rule. * * * Second, the error must be plain. To be 'plain' within the meaning of Crim.R. 52(B), an error

must be an 'obvious' defect in the trial proceedings. * * * Third, the error must have affected 'substantial rights[ ]' [to the extent that it] * * * affected the outcome of the trial.

*State v. Barnes*, 94 Ohio St.3d 21, 27 (2002). "Courts are to notice plain error 'only to prevent a manifest miscarriage of justice.'" *State v. Payne*, 114 Ohio St.3d 502, 2007-Ohio-4642, ¶ 16, quoting *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph three of the syllabus.

[A] criminal offense must be charged with reasonable certainty in the indictment so as to apprise the defendant of that which he may expect to meet and be required to answer; so that the court and jury may know what they are to try, and the court may determine without unreasonable difficulty what evidence is admissible.

*Horton v. State*, 85 Ohio St. 13, 19 (1911). "The purpose of an indictment is to afford a defendant notice of the charges against him." *State v. Feliciano*, 115 Ohio App.3d 646, 658 (9th Dist.1996).

{¶18} R.C. 2923.32 defines the offense of engaging in a pattern of corrupt activity and provides, in relevant part, as follows: "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." R.C. 2923.32(A)(1). "'Corrupt activity' means 'engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in' any of a series of listed criminal offenses." *State v. Brooks*, 9th Dist. No. 23950, 2008-Ohio-3104, ¶ 7, quoting R.C. 2923.31(I). "'Pattern of corrupt activity' means two or more incidents of corrupt activity * * * that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E).

{¶19} Ross argues that his indictment deprived him of due process because it failed to reasonably notify him of the basis of the charges against him. Neither of the counts against Ross

for engaging in a pattern of corrupt activity identified the predicate offenses that formed the corrupt activities at issue here by name, statute number, or specific act. Instead, both counts alleged that Ross engaged in a pattern of corrupt activity that involved offenses "enumerated in this indictment that constitute corrupt activity as defined in Section 2923.31 of the Revised Code[.]" His indictment included charges of bribery and having an unlawful interest in a public contract, both of which are corrupt activities for purposes of R.C. 2923.32(A)(1). *See* R.C. 2923.31(I)(2)(a) (defining "corrupt activity" for purposes of the crime of engaging in a pattern of corrupt activity).

{¶20} The State did not provide Ross with a bill of particulars in this case, but instead permitted open-file discovery. *See State v. Tebcherani*, 9th Dist. No. 19535, 2000 WL 1729456, *6 (Nov. 22, 2000), quoting *State v. McDay*, 9th Dist. No. 19610, 2000 WL 1349804, *2 (Sept. 20, 2000) ("[W]hen the state permits open-file discovery, 'a bill of particulars is not required.'"). Ross had access to all of the State's evidence, and his indictment specified that the acts of corrupt activity alleged here were enumerated elsewhere in the indictment. Moreover, the trial court defined "corrupt activity" for the jury and informed the jury of the crimes that constituted a "corrupt activity" for purposes of the charges against Ross. This was not an instance where the indictment at issue utterly failed to refer to any specific corrupt activity, *compare State v. Adkins*, 136 Ohio App.3d 765, 777 (3d Dist.2000), or where the State sought to argue predicate offenses other than those listed in the indictment. *See State v. Siferd*, 151 Ohio App.3d 103, 2002-Ohio-6801, ¶ 25 (3d Dist.). The record does not support the conclusion that Ross did not have notice of the charges against him. Even assuming that Ross' indictment, on its face, did not set forth his corrupt activity charges with reasonable certainty, we cannot conclude that the defect amounts to plain error. *See id.*; *State v. Burkitt*, 89 Ohio App.3d 214, 224-225 (2d Dist.1993)

(both rejecting plain error argument based on defect in indictment charging the offense of engaging in a pattern of corrupt activity). The jury convicted Ross of bribery and having an unlawful interest in a public contract, both of which are statutorily defined corrupt activities and both of which were enumerated in the indictment. Ross has not shown that, but for the alleged error in his indictment, the outcome of the proceedings clearly would have been different. *Barnes*, 94 Ohio St.3d at 27. Consequently, his first assignment of error is overruled.

<u>Assignment of Error Number Six</u>

THE VERDICTS ARE AGAINST THE SUFFICIENCY [OF] THE EVIDENCE IN VIOLATION OF MR. ROSS'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶21} In his sixth assignment of error, Ross argues that his convictions for bribery, unlawful interest in a public contract, money laundering, and engaging in a pattern of corrupt activity are based on insufficient evidence. We disagree.

{¶22} In order to determine whether the evidence before the trial court was sufficient to sustain a conviction, this Court must review the evidence in a light most favorable to the prosecution. *State v. Jenks*, 61 Ohio St.3d 259, 274 (1991).

> An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.

*Id.* at paragraph two of the syllabus; *see also State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997).

"In essence, sufficiency is a test of adequacy." *Thompkins* at 386.

**Bribery**

> No person, either before or after he is elected * * * as a public servant * * *, shall knowingly solicit or accept for himself or another person any valuable thing or valuable benefit to corrupt or improperly influence him or another public servant or party official with respect to the discharge of his or the other public servant's or party official's duty.

R.C. 2921.02(B).  A public servant is any "elected or appointed officer, or employee, or agent of the state or any political subdivision, whether in a temporary or permanent capacity * * *."  R.C. 2921.01(A), (B)(1).  "A person acts knowingly, regardless of his purpose, when he is aware that his conduct will probably cause a certain result or will probably be of a certain nature.  A person has knowledge of circumstances when he is aware that such circumstances probably exist."  R.C. 2901.22(B).  The foregoing offense constitutes the crime of bribery.  R.C. 2921.02(E).

{¶23}  Ross was convicted on three counts of bribery arising from three events: (1) the hiring of Collins, Gordon & Bostwick, the architectural firm for the Justice Center; (2) the hiring of R.P. Carbone Co., the construction management firm for the Justice Center; and (3) the purchase of the building at 25 East Avenue.  Ross does not deny that he was a public servant or that he received money from Jones after he was elected to office.  Instead, Ross argues that the State failed to prove bribery because, although he received numerous checks from Jones, the State did not link the checks directly to the Justice Center project or the purchase of 25 East Avenue.  Ross argues that Jones offered equivocal testimony as to the reason for the checks Jones wrote to Ross/MarketShape; some of which were designated "consulting" and some of which were paid prior to Jones receiving any money from the foregoing sources.

{¶24}  The record reflects that Jones wrote checks to Ross, either in his personal capacity or to MarketShape, in the following amounts on the following dates:

- $40,000 to Ross on May 19, 1999

- $85,500 to MarketShape on October 11, 1999

- $20,000 to MarketShape on December 15, 2000

- $50,000 to MarketShape on December 21, 2000

- $25,000 to MarketShape on January 31, 2001

- $5,000 to MarketShape on February 13, 2001

- $3,058 to MarketShape on March 19, 2001

- $5,000 to MarketShape on March 29, 2001

- $2,000 to MarketShape on April 25, 2001

- $5,000 to MarketShape on May 16, 2001

- $45,000 to Ross on May 19, 2001

- $26,000 to Ross on May 25, 2001

- $110,200 to MarketShape on August 9, 2001

- $90,024 to MarketShape on December 3, 2001

Jones signed an independent contractor agreement with Collins, Gordon & Bostwick on March 31, 1999; signed an independent contractor agreement with R.P. Carbone Co. on May 26, 1999; and completed the purchase for the building at 25 East Avenue on December 1, 2000. With the exception of the first two checks, therefore, Ross received all the foregoing checks from Jones after Jones secured his contracts with the firms for the Justice Center project and after he secured the building at 25 East Avenue. Moreover, Ross received the two earliest checks after he voted in favor of: (1) a resolution naming Collins, Gordon & Bostwick as the county's first choice for an architectural firm on April 1, 1999; and (2) a resolution naming R.P. Carbone Co. as the county's first choice for a construction management firm on May 27, 1999. Ross received the

remaining checks after he voted in favor of a resolution to purchase the 25 East Avenue building on November 30, 2000.

{¶25} Jones testified that it was "understood" that Ross would be receiving money as a result of Jones securing the contracts on the Justice Center project. He further testified that he and Ross discussed the specific percentage that Ross expected. According to Jones, he never paid Ross to act as his attorney or for any consulting work, although several of the checks contained notations that they were for "consulting." Jones indicated that he wrote "consulting" on the checks just so as "not to leave it blank." He also denied ever having purchased any items from MarketShape that would account for the size of the checks he was writing. Jones testified that the money Erie Shores received from the architectural and construction management firms for the Justice Center project would be shared with Ross, "probably through MarketShape." Additionally, he testified that he spoke with Ross about the building at 25 East Avenue before he purchased the building and sold it to the county. Jones wrote memorandum-styled notes to himself on a daily basis to keep track of the matters he needed to handle each day. Jones wrote on November 14, 2000, that he expected to obtain a profit of $150,000 from the sale of the 25 East Avenue building. Next to the $150,000 notation, Jones wrote Ross' name and several monetary figures. Jones testified that the figures referred to payments he would be making to MarketShape. As previously noted, Jones received a $150,000 profit on the building after the commissioners voted to purchase it on November 30, 2000. Jones began to write the remaining series of checks to MarketShape from Erie Shores on December 15, 2000. As to the last of the checks that Jones wrote to MarketShape after Ross was no longer in office, Jones testified that he thought the checks were for "monies that [were] owed from the Justice Center."

{¶26} Brenda Kobelka testified that she worked at Erie Shores as a staff accountant from March 1999 to July 2003 and would sign checks on behalf of Erie Shores. Kobelka recalled Ross visiting the Erie Shores office on occasion to meet with Jones. Jones informed Kobelka that she should designate the checks she wrote to Ross/MarketShape as payments for consulting. Kobelka specified, however, that Ross never provided Erie Shores with any invoices for services.

{¶27} Terry Oakes, a payroll supervisor for the Lorain County Auditor, testified that Ross earned an annual income as a commissioner of $43,735.14 in 1997; $45,434.95 in 1998; and $47,840.82 in 1999. Consequently, Ross received far more money from Jones than he ever earned during his time as a commissioner. Although Ross did not file any state income tax returns for 1997, 1998, or 1999, the bank records that the State introduced evidence that Ross deposited fourteen checks worth over $500,000 from Jones/Erie Shores. Ross deposited twelve of those checks into an account he opened for MarketShape. To the extent that MarketShape might have been viewed as a legitimate business enterprise, the State introduced evidence of one purchase agreement that Ross entered into on behalf of MarketShape. Michael Winiasz, the owner of Advanced Design Industries, Inc. ("Advanced Design"), testified that Ross approached him at some point in 1999 and placed an order with his company for the production of a few thousand CDs that MarketShape then would sell. According to Winiasz, Ross agreed to pay for a portion of the machine that Winiasz had to buy to complete the purchase order because they had contemplated an ongoing business relationship. After Advanced Design produced the order for Ross, Winiasz sent Ross multiple invoices. Winiasz ultimately billed Ross in the total amount of $11,926.31. The first invoice was dated October 29, 1999, less than two weeks after

Erie Shores wrote a check to MarketShape for $85,000. Even so, Ross only ever paid Advance Design $6,347.95. Winiasz never received any further payments.

{¶28} Viewing the evidence in a light most favorable to the State, we cannot conclude that Ross' bribery convictions are based on insufficient evidence. Ross approached Jones with the Justice Center project and arranged for his participation in the project with the understanding that Jones would forward him a portion of the money Jones received. The two also met and discussed a financial arrangement before the commissioners voted to purchase the building at 25 East Avenue from Jones. The State presented evidence that Jones paid Ross substantial sums of money, and that Ross voted in favor of resolutions that benefitted Jones. Ross received checks from Jones after: 1) voting in favor of Collins, Gordon & Bostwick being named the top choice for an architectural firm; 2) voting in favor of R.P. Carbone Co. being named the top choice for a construction management firm; and 3) voting in favor of the county purchasing the building at 25 East Avenue. A rational trier of fact could have found that Ross solicited money from Jones in exchange for his vote. *See* R.C. 2921.02(B). Further, a rational trier of fact could have found that MarketShape was primarily a front for the illicit funds Ross received. Ross' argument that his bribery convictions are based on insufficient evidence lacks merit.

**Unlawful Interest in a Public Contract**

{¶29} "No public official shall knowingly * * * [a]uthorize, or employ the authority or influence of [his] office to secure authorization of any public contract in which [he] * * * or any of [his] business associates has an interest[.]" R.C. 2921.42(A)(1). A public contract includes the purchase or contract for the purpose of property or services for use by any political subdivision and any contract for the design or construction of public property. Former R.C.

2921.42(G)(1)(a), (b). Whoever commits the foregoing offense is guilty of having an unlawful interest in a public contract. R.C. 2921.42(E).

{¶30} The jury convicted Ross of seven separate counts of having an unlawful interest in a public contract. The counts pertained to the following seven resolutions:

- Resolution No. 99-890 passed November 4, 1999, authorized Erie Shores to act as internet service provider for a maximum annual cost of $20,799

- Resolution No. 99-942 passed November 23, 1999, authorized the payment of $28,048 to Erie Shores to deliver, configure, install and support a Compaq Proliant 3000 Server Project for the County Commissioners' Office

- Resolution No. 99-1019 passed December 28, 1999, authorized the purchase of six computers and computer equipment from Erie Shores for $16,718

- Resolution No. CH00-13 passed March 2, 2000, authorized the purchase of upgraded computer software from Erie Shores for $4,622

- Resolution No. 00-434 passed June 1, 2000, authorized the purchase of two computers and two printers from Erie Shores for $4,861

- Resolution No. 00-939 passed November 30, 2000, authorized the purchase of the property located at 25 East Avenue from Erie Shores for $400,000

- Resolution No. 00-1021A passed December 21, 2000, accepted a proposal from Erie Shores to enter into a Computer Maintenance Agreement

Ross voted in favor of all seven resolutions and led the vote to adopt all but one of the resolutions.

{¶31} Ross argues that the State failed to prove its case against him for having an unlawful interest in public contracts because "[t]here was no evidence that [he] had any

association or interest in Erie Shores." The State's theory, however, was not that Ross had an association with Erie Shores, but that Jones had an association with MarketShape, the company that belonged to Ross.

**{¶32}** Jones wrote eleven checks directly to MarketShape between October 1999 and December 2001. According to Jones, while he was paying Ross his cut of the money from the Justice Center project, he and Ross also discussed that some of the money he paid Ross would be an investment in MarketShape. Jones testified that he considered himself to be an investor in MarketShape and that he had a business association with Ross through the company. He was able to describe the essence of the company and the types of products it purported to sell. Jones also testified that he had used his business association with Ross' company to increase his line of credit for Erie Shores when it underwent financial difficulties.

**{¶33}** Elizabeth Blair, one of the other County Commissioners during the time that Ross served, testified that Ross never disclosed any business association with Jones when the commissioners voted on the foregoing resolutions. Ross has not offered any argument as to why his business association with Jones through MarketShape could not satisfy R.C. 2921.42(A)(1). *See* App.R. 16(A)(7). Viewing the evidence in a light most favorable to the State, we conclude that the State presented sufficient evidence that Ross had an undisclosed business association with Jones and used his position to secure seven public contracts for Jones, his business associate. Ross' argument that his R.C. 2921.42(A)(1) convictions are based on insufficient evidence lacks merit.

**Money Laundering**

**{¶34}** R.C. 1315.55 governs the crime of money laundering and provides, in relevant part, as follows:

(A)(1) No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the purpose of committing or furthering the commission of corrupt activity.

(2) No person shall conduct or attempt to conduct a transaction knowing that the property involved in the transaction is the proceeds of some form of unlawful activity with the intent to conceal or disguise the nature, location, source, ownership, or control of the property or the intent to avoid a transaction reporting requirement under section 1315.53 of the Revised Code or federal law.

(3) No person shall conduct or attempt to conduct a transaction with the purpose to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on of corrupt activity.

(4) No person shall conduct or structure or attempt to conduct or structure a transaction that involves the proceeds of corrupt activity that is of a value greater than ten thousand dollars if the person knows or has reasonable cause to know that the transaction involves the proceeds of corrupt activity.

R.C. 1315.55(A)(1)-(5). A person knows or has reasonable cause to know that proceeds are from a corrupt activity if the person "knows or has reasonable cause to know that the proceeds are from some form of activity that constitutes corrupt activity, though not necessarily which form of corrupt activity[.]" R.C. 1315.55(C)(1). Whoever commits the foregoing offense is guilty of money laundering. R.C. 1315.99(C).

{¶35} Ross was convicted of four counts of money laundering. All four counts stemmed from the same date range, October 1, 1999, to July 31, 2002, but different statutory subsections of R.C. 1315.55(A). Ross does not challenge any particular element of any of his money laundering convictions. Rather, he briefly asserts that his convictions are based on insufficient evidence because the State failed to prove that he "did anything to disguise or misrepresent the source of any funds."

{¶36} The only subsection of R.C. 1315.55(A) that requires proof that a person intentionally disguised or misrepresented the source of funds is subsection (A)(2). Thus, Ross has failed to offer any analysis in support of his argument that his convictions under subsections

(A)(1), (A)(3), or (A)(4) are based on insufficient evidence. *See* App.R. 16(A)(7). Moreover, as discussed above, the State presented evidence that Ross accepted numerous payments from Jones related to his dealings in the Justice Center project and the sale of 25 East Avenue. Ross did not file any tax returns so as to report the income. He deposited the checks from Jones into either his IOLTA account or his MarketShape account, despite the fact that the money was not for legal services or a legitimate transaction with his company. The State presented sufficient evidence from which a rational trier of fact could deduce that Ross intentionally funneled the money he received from Jones through his two accounts to conceal or disguise it. *See* R.C. 1315.55(A)(2). His argument that his money laundering convictions are based on insufficient evidence lacks merit.

**Engaging in a Pattern of Corrupt Activity**

{¶37} "No person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity or the collection of an unlawful debt." R.C. 2923.32(A)(1). An "enterprise" may include any individual, legal entity, "or any organization, association, or group of persons associated in fact although not a legal entity." R.C. 2923.31(C). The phrase "pattern of corrupt activity" means "two or more incidents of corrupt activity, whether or not there has been a prior conviction, that are related to the affairs of the same enterprise, are not isolated, and are not so closely related to each other and connected in time and place that they constitute a single event." R.C. 2923.31(E). R.C. 2923.31(I) defines "corrupt activity" as "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" a number of offenses enumerated therein. Whoever commits the foregoing offense is guilty of engaging in a pattern of corrupt activity. R.C. 2923.32(B)(1).

**{¶38}** Ross' sole argument here is that because there was insufficient evidence to prove the predicate acts of bribery, unlawful interest in a public contract, and money laundering, there also was insufficient evidence to prove that he engaged in a pattern of corrupt activity. Having already determined that Ross' other convictions are supported by sufficient evidence, we reject his argument. Ross' sixth assignment of error is overruled.

Assignment of Error Number Seven

> THE VERDICTS ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE IN VIOLATION OF MR. ROSS'S RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE I, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶39}** In his seventh assignment of error, Ross argues that his convictions are against the manifest weight of the evidence. We disagree.

**{¶40}** In determining whether a conviction is against the manifest weight of the evidence an appellate court:

> must review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.

*State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist.1986). A weight of the evidence challenge indicates that a greater amount of credible evidence supports one side of the issue than supports the other. *Thompkins*, 78 Ohio St.3d at 387. Further, when reversing a conviction on the basis that the conviction was against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and disagrees with the factfinder's resolution of the conflicting testimony. *Id.* Therefore, this Court's "discretionary power to grant a new trial should be exercised only in the

exceptional case in which the evidence weighs heavily against the conviction." *State v. Martin*, 20 Ohio App.3d 172, 175 (1st Dist.1983). *Accord Otten*, 33 Ohio App.3d at 340.

{¶41} Ross argues that his convictions are against the manifest weight of the evidence because the evidence showed that he merely tried to help Jones with a business venture by allowing him to invest in MarketShape. He further argues that the jury lost its way in convicting him because he presented testimony that he had to ask to borrow money from a personal friend at some point between 1998 and 2000. Ross avers that, had he been accepting "bribe money" from Jones, he would not have needed to turn to anyone for a loan.

{¶42} The fact that Ross may have asked to borrow money from a friend is irrelevant, as the bank records that the State introduced prove that Ross deposited over $500,000 worth of checks from Jones. Without question, Ross received large amounts of money during the time period that he allegedly had to ask a friend for a loan. The only matter for the jury to determine was whether the money from Jones stemmed from illegal activity. This Court has repeatedly recognized that the jury is in the best position to judge the credibility of witnesses because the jury "is best able to view witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Cook*, 9th Dist. No. 21185, 2003-Ohio-727, ¶ 30, quoting *Giurbino v. Giurbino*, 89 Ohio App.3d 646, 659 (8th Dist.1993). The jury here chose to believe that Ross and Jones were not merely engaging in a legitimate business venture. In addition to the testimony presented at trial, the State produced a large number of documents, which corroborated its theory that Ross accepted large sums of money to influence the performance of his duties as Commissioner. Given the evidence in the record, we cannot agree that Ross' convictions are against the manifest weight of the evidence. Ross' seventh assignment of error is overruled.

Assignment of Error Number Five

THE TRIAL COURT'S INSTRUCTIONS TO THE JURY WERE INCOMPLETE AND INACCURATE, AND THEREFORE DEPRIVED MR. ROSS OF A FAIR TRIAL IN VIOLATION OF HIS RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶43} In his fifth assignment of error, Ross argues that the trial court committed plain error by erroneously instructing the jury. Specifically, he argues that the trial court incorrectly instructed the jury on the weight to afford accomplice testimony and the crimes that constitute corrupt activities for purposes of R.C. 2923.32 (engaging in a pattern of corrupt activity).

{¶44} "[A] defendant's failure to object to an allegedly erroneous jury instruction limits any review of the alleged error to a review for plain error." *State v. Davis*, 9th Dist. No. 25399, 2011-Ohio-5630, ¶ 25. As previously noted, "[t]o prevail on a claim of plain error, a defendant 'must establish that the outcome of the trial would clearly have been different but for the trial court's allegedly improper actions.'" *State v. Johnson*, 9th Dist. No. 25525, 2011-Ohio-3941, ¶ 20, quoting *State v. Waddell*, 75 Ohio St.3d 163, 166 (1996).

**Accomplice Testimony Instruction**

{¶45} R.C. 2923.01 governs conspiracies and provides that, if a co-conspirator testifies against a defendant charged with conspiracy, the trial court shall instruct the jury on accomplice testimony. R.C. 2923.01(H)(2). The instruction shall "substantially" consist of the following:

> The testimony of an accomplice that is supported by other evidence does not become inadmissible because of the accomplice's complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect the witness' credibility and make the witness' testimony subject to grave suspicion, and require that it be weighed with great caution.

> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

R.C. 2923.01(H)(2). The accomplice instruction contained in R.C. 2923.01(H)(2) is identical in substance to the accomplice instruction required in cases where accomplices testify against a defendant charged with complicity. *See* R.C. 2923.03(D).

{¶46} In determining whether an erroneous accomplice instruction amounts to plain error, this Court examines several factors.

> First, we look at the scope of cross-examination of the accomplice that was permitted by the trial court. Second, we review whether the details of the accomplice's plea agreement were presented to the jury. Third, we examine whether the jury instructions given contain much of the substance mandated by R.C. 2923.[01(H)(2)]. Finally, we look to whether the accomplice's testimony was favorable to the defendant, justifying the failure to request the instruction as a tactical decision.

(Internal citations omitted.) *State v. Simpson*, 9th Dist. No. 25363, 2011-Ohio-2771, ¶ 19, citing *State v. Davis*, 9th Dist. No. 22395, 2005-Ohio-4083, ¶ 16. As with any claim of plain error, the ultimate inquiry must be whether the error was outcome-determinative in nature. *See State v. Banaag*, 9th Dist. No. 98CA0033, 2000 WL 108856, *4 (Jan. 26, 2000).

{¶47} The trial court instructed the jury as follows with regard to the accomplice testimony the State presented at trial:

> You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief.
>
> You have heard testimony from Larry Jones, Ronald Gordon and Vincent Carbone, other persons who pleaded guilty to the same crime charged in this case and are said to be an accomplice. An accomplice is one who knowingly assists or joins another in the commission of a crime. Whether Larry Jones, Ronald Gordon and/or Vincent Carbone were accomplices and the weight to give to his or any one of their testimony are matters for you to determine.

This Court previously has concluded that the type of instruction the trial court gave here does not satisfy the required accomplice instruction set forth above. *Simpson* at ¶ 22-28. Accordingly, we must determine whether the trial court's error rises to the level of plain error.

**{¶48}** Ross was permitted to extensively cross-examine all of the accomplices (Jones, Gordon, and Carbone) in this case. Further, the jury was fully aware of the exact details of the plea agreements that Jones, Gordon, and Carbone received because, in addition to their being questioned about the agreements, the agreements themselves were admitted into evidence. The testimony of Gordon and Carbone also could be considered somewhat favorable to Ross, as both indicated that they never spoke with or dealt with Ross on the Justice Center project. Both men indicated that they only dealt with Finkel and/or Jones. Additionally, although Jones' testimony was not favorable to Ross, the documentary evidence that the State presented fully corroborated the testimony he offered. *Compare Simpson*, 2011-Ohio-2771, at ¶ 28; *State v. Davis*, 9th Dist. No. 22395, 2005-Ohio-4083, ¶ 20-21 (both concluding that the appellant was prejudiced by an improper accomplice instruction because there was insufficient corroborative evidence to support the appellant's conviction). Ross has not shown that, had the court properly instructed the jury on accomplice testimony under R.C. 2923.01(H)(2), he would not have been convicted. *Banaag*, 2000 WL 108856, at *4. Therefore, we conclude that the trial court's error in instructing the jury here did not rise to the level of plain error. *See id.*, at *4-5; *State v. Wynn*, 9th Dist. No. 97CA006968, 1999 WL 247786, *4 (Apr. 28, 1999).

**{¶49}** Ross also includes a very short argument in his brief that the trial court committed a second error in instructing the jury on accomplice testimony. He argues that he was prejudiced because the court did not tell the jury that "[n]o person shall be convicted of conspiracy upon the testimony of a person with whom the defendant conspired, unsupported by other evidence." R.C. 2923.01(H)(1). As we previously determined, however, Ross' convictions were supported by other evidence. Ross has not offered any explanation as to how the court's failure to give the jury an instruction under R.C. 2923.01(H)(1) actually affected the outcome in this matter. *See*

*Banaag*, 2000 WL 108856, at \*4; App.R. 16(A)(7). Ross' argument that he was prejudiced by the court's error in instructing the jury is meritless.

**Predicate Offense Instruction**

{¶50} A conviction for engaging in a pattern of corrupt activity requires proof that an offender committed statutorily defined "corrupt activities." R.C. 2923.32. The phrase "'[c]orrupt activity' means 'engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in' any of a series of listed criminal offenses." *Brooks*, 2008-Ohio-3104, at ¶ 7, quoting R.C. 2923.31(I). The trial court here instructed the jury that one crime that constitutes a "corrupt activity" is conspiracy to engage in a pattern of corrupt activity. Although R.C. 2923.31(I) does include "conspiring to engage in" certain offenses as a "corrupt activity," one of those offenses is not engaging in a pattern of corrupt activity. R.C. 2923.31(I)(2)(a). Thus, the court misidentified one of the predicate offenses for engaging in a pattern of corrupt activity in instructing the jury.

{¶51} Ross argues that the trial court's error in instructing the jury affected the outcome in this matter and necessitates a reversal of his convictions. The record reflects, however, that the trial court properly instructed the jury that both bribery and having an unlawful interest in a public contract are statutorily defined corrupt activities. *Id.* The jury found Ross guilty of three counts of bribery and seven counts of having an unlawful interest in a public contract; a total of ten predicate offenses for purposes of R.C. 2923.32(A)(1). To demonstrate a "pattern of corrupt activity," the State need only prove "two or more incidents of corrupt activity * * * related to the affairs of the same enterprise[.]" R.C. 2923.31(E). The jury convicted Ross of five-times the number of predicate offenses necessary to sustain a conviction for engaging in a pattern of corrupt activity. *See id.*; R.C. 2923.31(I)(2)(a); R.C. 2923.32(A)(1). We do not agree, therefore,

with Ross' assertion that the trial court's error affected the outcome in this matter. *See Banaag*, 2000 WL 108856, at *4. Ross' fifth assignment of error is overruled.

<u>Assignment of Error Number Four</u>

MR. ROSS WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL IN VIOLATION OF HIS RIGHTS UNDER THE SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

**{¶52}** In his fourth assignment of error, Ross argues that he received ineffective assistance of counsel. We disagree.

**{¶53}** To prove an ineffective assistance claim, Ross must show two things: (1) that counsel's performance was deficient to the extent that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment" and (2) that "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To demonstrate prejudice, Ross must prove that "there exists a reasonable probability that, were it not for counsel's errors, the result of the trial would have been different." *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph three of the syllabus. "An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland* at 691. Furthermore, this Court need not address both *Strickland* prongs if an appellant fails to prove either one. *State v. Ray*, 9th Dist. No. 22459, 2005-Ohio-4941, ¶ 10.

**{¶54}** Ross argues that his trial counsel was ineffective for the following reasons: (1) he failed to request that a special prosecutor investigate the charges; (2) he failed to move for dismissal on the basis of selective prosecution; (3) he did not obtain a bill of particulars; (4) he did not file a timely motion for prejudicial pre-trial delay; (5) he failed to object to hearsay testimony; (6) he failed to object to erroneous jury instructions; and (7) he failed to strike a juror

who indicated that he or she worked at Lorain National Bank. Initially, we reject the argument that Ross' counsel was ineffective for not obtaining a bill of particulars because the State permitted open-file discovery in this case. *Tebcherani*, 2000 WL 1729456, at *6, quoting *McDay*, 2000 WL 1349804, at *2 ("[W]hen the state permits open-file discovery, 'a bill of particulars is not required.'"). We further reject Ross' argument regarding his counsel's failure to object to erroneous jury instructions, as his argument relates to the same instructions this Court addressed in assignment of error number five. This Court already determined that the trial court's erroneous jury instructions did not affect the outcome in this matter. *See Strickland*, 466 U.S. at 691. As such, we confine our ineffective assistance analysis to the remaining five bases Ross asserts.

**Special Prosecutor**

{¶55} R.C. 2941.63 permits, but does not require, a trial court to appoint an attorney to assist the prosecuting attorney "whenever it is of the opinion that the public interest requires it[.]" "An attorney appointed pursuant to the inherent power of the court is sometimes referred to as a 'special' prosecuting attorney." *State ex rel. Williams v. Zaleski*, 12 Ohio St.3d 109, 111-112 (1984). Ross argues that because this case had significant ties to Lorain and the Lorain prosecutor's office had affiliations with the Lorain County Commissioners, there was "no strategic reason for failing [to] request an independent prosecutor to evaluate the case[.]" Yet, an attorney's lack of strategy will not suffice to demonstrate a claim of ineffective assistance absent a showing that it affected the judgment. *Strickland*, 466 U.S. at 691. Even assuming that Ross' counsel should have requested a special prosecutor, there is no evidence that his failure to do so had any bearing on Ross' convictions. *See generally State v. Hooks*, 2d Dist. Nos. CA 16978 &

CA 17007, 1998 WL 754574, *8 (Oct. 30, 1998). Ross' ineffective assistance argument on this ground must fail.

**Selective Prosecution**

{¶56} "A selective-prosecution claim is not a defense on the merits to the criminal charge itself, but an independent assertion that the prosecutor has brought the charge for reasons forbidden by the Constitution." *State v. Sanchez*, 9th Dist. No. 09CA009582, 2010-Ohio-4660, ¶ 33, quoting *State v. Getsy*, 84 Ohio St.3d 180, 203 (1998). Selective prosecution claims sound in equal protection and protect against prosecutions "based on 'an unjustifiable standard such as race, religion, or other arbitrary classification.'" *State v. LaMar*, 95 Ohio St.3d 181, 2002-Ohio-2128, ¶ 43, quoting *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

> To support a claim of selective prosecution, a defendant bears the heavy burden of establishing, at least prima facie, (1) that, while others similarly situated have not generally been proceeded against because of conduct of the type forming the basis of the charge against him, he has been singled out for prosecution, and (2) that the government's discriminatory selection of him for prosecution has been invidious or in bad faith, i.e., based upon such impermissible considerations as race, religion, or the desire to prevent his exercise of constitutional rights.

(Internal quotations and citations omitted.) *State v. Michel*, 181 Ohio App.3d 124, 2009-Ohio-450, ¶ 10 (9th Dist.). "The conscious exercise of some selectivity in enforcement is not in itself * * * a violation of the United States Constitution." *State v. Flynt*, 63 Ohio St.2d 132, 134 (1980).

{¶57} Ross argues his trial counsel was ineffective for failing to seek a dismissal on the grounds of selective prosecution because he could have presented evidence that he was prosecuted "solely on the ground of race." Ross insists that other individuals in Lorain County engaged in conduct similar to his own, but they were not indicted as a result. Ross' counsel pursued this theory to some degree when questioning Jones. Jones admitted that it was not

uncommon for him to make campaign contributions to elected officials in the hope that they might favor his business in the future. Jones qualified, however, that he submitted those campaign contributions to campaign committees, not directly to the elected officials. Ross personally received over $500,000 from Jones, and the money was not for a campaign contribution. Ross' argument that the State selectively prosecuted him is wholly speculative in nature. *See State v. Halsell*, 9th Dist. No. 24464, 2009-Ohio-4166, ¶ 30 ("A defendant must demonstrate actual prejudice, and speculation regarding the prejudicial effects of counsel's performance will not establish ineffective assistance of counsel."). Absent any substantiating evidence within the record, there is no evidence that Ross' counsel's performance was deficient because he failed to seek a dismissal for selective prosecution or that Ross suffered any prejudice as a result of that failure. As such, we must conclude that this argument also lacks merit. *See State v. Brown*, 6th Dist. No. OT-95-040, 1996 WL 139626, *9 (Mar. 29, 1996) (rejecting ineffective assistance of counsel argument based on failure to argue selective prosecution).

**Pre-trial Delay**

{¶58} Ross' entire argument here consists of the following:

> Counsel for Mr. Ross filed a Motion to Dismiss both indictments on the ground of prejudicial pre-indictment delay. It was denied on the ground that it was not timely filed. (Tr. At 8; R. at 89, 54). As discussed above, the trial court erred in not granting this motion, and counsel's failure to timely file the motion was ineffective.

The argument amounts to nothing more than a blanket assertion, unaccompanied by any analysis or supporting authority. *See* App.R. 16(A)(7).

{¶59} Presumably, by including the phrase "[a]s discussed above," Ross intends to refer this Court back to his argument in his third assignment of error. Ross argued in his third assignment of error that the pre-indictment delay here was prejudicial because two witnesses,

one of whom was Finkel, died at some undetermined point before trial. Once again, however, the theory that the witnesses who died before trial would have 1) testified on Ross' behalf, and 2) done so favorably, is pure speculation. A defendant must show actual prejudice as a result of pre-indictment delay. *State v. Marrero*, 9th Dist. No. 09CA009738, 2010-Ohio-3663, ¶ 7. Moreover, "[t]he evidence of actual prejudice 'must be specific and not speculative[';] meaning the defendant must demonstrate how the evidence that was lost due to delay would have aided the defense." *Saxon*, 2009-Ohio-6905, at ¶ 9, quoting *State v. Barnhardt*, 9th Dist. No. 05CA008706, 2006-Ohio-4531, ¶ 16. Ross has not demonstrated actual prejudice such that, had his counsel filed a timely motion, he would have prevailed upon it. *See Strickland*, 466 U.S. at 691. Consequently, we reject his argument.

**Hearsay Testimony**

{¶60} Ross argues that his counsel was ineffective because he failed to object to the introduction and admission of an email between Ross and Jones on the basis that the email was hearsay. Hearsay is "a statement, other than one made by the declarant while testifying at the trial * * *, offered in evidence to prove the truth of the matter asserted." Evid. R. 801(C). Yet, a statement is not hearsay if it is offered against a party and is "a statement by a co-conspirator * * * during the course and in furtherance of the conspiracy upon independent proof of the conspiracy." R.C. 801(D)(2)(e).

{¶61} In the email, dated July 20, 2002, Jones references large amounts of money he gave to Ross. Specifically, Jones writes that: "Erie Shores has been exceedingly good to you. In the last two and a half years, the total is around $245,000, not including the County project." The email is not a model of clarity, but in essence expresses Jones' frustration at Ross for accepting money from him and not doing enough for Jones in return. Even assuming that the

email from Jones does not fall under the purview of Evid.R. 801(D)(2) as the statement of a co-conspirator, it is not clear how Ross suffered any prejudice as a result of its admission. Ross' only argument is that the admission of the email "was prejudicial to [his] defense[.]" He does not explain why the email was prejudicial or offer any authority in support of his argument. App.R. 16(A)(7). The email merely corroborated the State's theory that Jones had paid Ross large sums of money; a fact of which the jury was well aware given Jones' testimony and the documentary evidence that the State introduced. Based on our review of the record, we conclude that Ross has not demonstrated that he received ineffective assistance of counsel on this basis.

**Preemptory Challenge**

{¶62} Finally, Ross argues that he received ineffective assistance of counsel because his attorney failed to strike a juror who indicated that she worked at Lorain National Bank. The juror was never identified by name in voir dire, but stated that she had worked at the bank until about two years before trial. Lorain National Bank was the bank where Ross had his IOLTA account as well as the account he opened for MarketShape. During voir dire, the juror indicated that she was familiar with Jones because Erie Shores had taken loans from the bank, but further indicated that she never worked on any of the loans. Nor was the juror familiar with Ross himself. Ross merely argues that his counsel was ineffective for failing to strike the juror because, given the juror's familiarity with some of the witnesses and "possibly some of the evidence," there was "a great risk" that she might have considered evidence outside the record in reaching a verdict. We conclude that this argument amounts to nothing more than speculation. As such, it is without merit. *Halsell*, 2009-Ohio-4166, at ¶ 30. Ross' fourth assignment of error is overruled.

<u>Assignment of Error Number Eight</u>

MR. ROSS'S CONVICTIONS FOR ENGAGING IN A PATTERN OF CORRUPT ACTIVITY, A FELONY OF THE FIRST DEGREE, AND CONSPIRACY, A FELONY OF THE THIRD DEGREE, VIOLATED O.R.C. §2945.75(A)(2) BECAUSE THE JURY VERDICTS DID NOT INCLUDE THE DEGREE OF THE OFFENSE, NOR ANY AGGRAVATING ELEMENTS.

{¶63} In his eighth assignment of error, Ross argues that the offense level of several of his convictions must be reduced due to an error with the verdict forms. We agree.

{¶64} R.C. 2945.75(A)(2) provides, in relevant part, that:

[w]hen the presence of one or more additional elements makes an offense one of more serious degree * * * [a] guilty verdict shall state either the degree of the offense of which the offender is found guilty, or that such additional element or elements are present. Otherwise, a guilty verdict constitutes a finding of guilty of the least degree of the offense charged.

In *Pelfrey*, the Ohio Supreme Court interpreted R.C. 2945.75(A)(2) pursuant to its plain language and held that a jury's verdict form "must include either the degree of the offense of which the defendant is convicted or a statement that an aggravating element has been found to justify convicting a defendant of a greater degree of a criminal offense." *State v. Pelfrey*, 112 Ohio St.3d 422, 2007-Ohio-256, ¶ 14. Any convictions that contain a *Pelfrey* error must be vacated so that a defendant may be resentenced accordingly. *State v. Brown*, 9th Dist. No. 25077, 2010-Ohio-4453, ¶ 18-19.

{¶65} Ross challenges his convictions on counts one (engaging in a pattern of corrupt activity), three (conspiracy), and four (conspiracy) on the basis of *Pelfrey* errors. Both the engaging in a pattern of corrupt activity and conspiracy statutes contain multiple offense levels depending on the nature of the underlying predicate offense(s) or object(s) of the conspiracy, respectively. R.C. 2923.32(B)(1); R.C. 2923.01(J)(1)-(4). Former R.C. 2923.32 provides, in relevant part, as follows:

Whoever violates this section is guilty of engaging in a pattern of corrupt activity. Except as otherwise provided in this division, engaging in corrupt activity is a

felony of the second degree. If at least one of the incidents of corrupt activity is a felony of the first, second, or third degree, * * * engaging in a pattern of corrupt activity is a felony of the first degree.

R.C. 2923.32(B)(1). The conspiracy statute provides, in relevant part, that:

Whoever violates this section is guilty of conspiracy, which is one of the following:

* * *

(2) A felony of the next lesser degree than the most serious offense that is the object of the conspiracy, when the most serious offense that is the object of the conspiracy is a felony of the first, second, third, or fourth degree;

* * *

(4) A misdemeanor of the first degree, when the most serious offense that is the object of the conspiracy is a felony of the fifth degree.

R.C. 2923.01(J)(1)-(4). Ross was convicted of a first-degree felony on count one (engaging in a pattern of corrupt activity), a second-degree felony on count three (conspiracy), and a second-degree felony on count four (conspiracy). Accordingly, he was convicted of a higher offense-level than the minimum offense-level for each count. *See* R.C. 2923.32(B)(1) (providing for a minimum offense level of a second-degree felony); R.C. 2923.01(J)(4) (providing for a minimum offense level of a first-degree misdemeanor).

{¶66} The verdict forms for counts one, three, and four here do not contain any offense levels or aggravating elements. In previously considering a statute similar to the one at hand, this Court applied *Pelfrey* and concluded that the verdict forms were insufficient to sustain a conviction in excess of the minimum offense-level. *State v. McIntyre*, 9th Dist. Nos. 24934 & 24945, 2010-Ohio-2569, ¶ 11-14. We explained in *McIntyre* that "[a] violation of R.C. 2921.32 can be a misdemeanor or a first, second, third, or fifth-degree felony, depending upon the underlying degree of the crime committed by the person aided." *Id.* at ¶ 14. Because McIntyre's conviction did not include the degree of the offense or an aggravating element, we vacated his

conviction and remanded the matter for resentencing. *Id.* Much like the statute in *McIntyre*, a violation of either R.C. 2923.32 (engaging in a pattern of corrupt activity) or R.C. 2923.01 (conspiracy) can result in different offense levels depending upon the underlying degree of the predicate offense(s) or object(s) of the conspiracy, respectively. Pursuant to *Pelfrey*, the verdict forms here were required to state either the degree of the foregoing offenses or aggravating elements. *Pelfrey*, 2007-Ohio-256, at syllabus; *McIntyre* at ¶ 11-14. Because they did not, Ross' convictions for first-degree felony engaging in a pattern of corrupt activity (count one) and second-degree felony conspiracy (counts three and four) must be vacated. *McIntyre* at ¶ 14. Upon remand, Ross may be convicted only of second-degree felony engaging in a pattern of corrupt activity (count one) and two counts of first-degree misdemeanor conspiracy (counts three and four).[3] Ross' eighth assignment of error is sustained.

## Assignment of Error Number Two

THE INDICTMENT WAS MULTIPLICITOUS IN VIOLATION OF MR. ROSS'S DUE PROCESS RIGHTS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO CONSTITUTION.

## Assignment of Error Number Ten

THE TRIAL COURT ERRED IN IMPOSING SENTENCES FOR ALLIED OFFENSES OF SIMILAR IMPORT.

{¶67} In his second assignment of error, Ross challenges the validity of several of his convictions on the basis that his indictment was multiplicitous in nature. Specifically, he argues that the indictment did not differentiate between his two charges for engaging in a pattern of corrupt activity, his two conspiracy charges, and his three charges for bribery. In his tenth assignment of error, Ross argues that the trial court erred by convicting him of allied offenses of

---

[3] This Court recognizes that Ross ultimately may not be convicted of all three offenses, should the trial court determine that one or more of Ross' offenses are allied offenses of similar import.

similar import. He avers that all of his convictions, with the exception of his conviction for failing to file a tax return, are allied offenses of similar import that should have been merged for purposes of sentencing.

{¶68} Once again, Ross failed to object below on the basis he now alleges. Accordingly, we incorporate the standard of review discussion set forth in his first assignment of error and only conduct a plain error review. *Horner*, 2010-Ohio-3830, at paragraph three of the syllabus. *See also State v. Hardy*, 8th Dist. No. 82620, 2004-Ohio-56, ¶ 20-21.

{¶69} An indictment is multiplicitous if it charges "a single offense in several counts." *State v. Smith*, 9th Dist. No. 8869, 1978 WL 215411, *2 (Oct. 4, 1978). *Accord State v. Johnson*, 1st Dist. Nos. C-0801195 & C-0801196, 2009-Ohio-6800, ¶ 19 ("Multiplicity occurs when a single crime has been arbitrarily divided or separated into two or more separate counts."). "[T]he vice of a multiplicitous indictment lies in the possibility of multiple punishments for a single offense in violation of the cumulative punishment branch of the Double Jeopardy Clause of the Fifth Amendment." *State v. Childs*, 88 Ohio St.3d 558, 561 (2000). Yet, a merger of multiplicitous counts for purposes of sentencing may defeat a claimed violation of Double Jeopardy. *Id.* Further, [t]he Double Jeopardy Clause is not violated * * * where the legislature has evinced an intent to permit multiple punishments for a single offense." *Id.* "In Ohio, the primary legislative statement on the multiplicity issue is found in R.C. 2941.25, concerning allied offenses of similar import." *Id.* *See also Johnson*, 2009-Ohio-6800, at ¶ 20; *State v. Dudas*, 11th Dist. Nos. 2008-L-109 & 2008-L-110, 2009-Ohio-1001, ¶ 45; *State v. Blalock*, 8th Dist. Nos. 80419 & 80420, 2002-Ohio-4580, ¶ 75-76; *State v. Banks*, 10th Dist. No. 92AP-859, 1993 WL 194118, *8 (June 3, 1993).

> In *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, the Ohio Supreme Court held that '[w]hen determining whether two offenses are allied offenses of

similar import subject to merger under R.C. 2941.25, the conduct of the accused must be considered.' *Id.* at syllabus. Since then, this Court has consistently remanded cases for further proceedings in the trial court to apply *Johnson* for the first time. *See, e.g.*, *State v. Creel*, 9th Dist. No. 25476, 2011-Ohio-5893, ¶ 4.

*State v. Daniels*, 9th Dist. No. 25808, 2011-Ohio-6414, ¶ 12. The trial court here did not have the opportunity to consider *Johnson* so as to determine whether Ross' convictions are allied offenses. Further, if any of the offenses here are allied, the State has not yet "had the opportunity to elect on which offense it wishes to proceed for sentencing." *Creel* at ¶ 4. Consistent with our precedent, we must remand the matter to the trial court for it to apply *Johnson* in the first instance. *Id.* Ross' tenth assignment of error is sustained on this basis.

{¶70} Given our resolution of Ross' tenth assignment of error, we must conclude that his second assignment of error is not yet ripe for review. Because a merger of multiplicitous counts may defeat a claimed Double Jeopardy violation, *Childs*, 88 Ohio St.3d at 561, the viability of Ross' alleged Double Jeopardy violation depends upon the trial court's resolution of the allied offense issue. Consequently, we decline to address his second assignment of error.

Assignment of Error Number Nine

THE CUMULATIVE EFFECT OF ALL OF THESE ERRORS DEPRIVED APPELLANT OF A FAIR TRIAL IN VIOLATION OF [HIS] RIGHTS UNDER THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION, AND ARTICLE ONE, SECTION 10 OF THE OHIO STATE CONSTITUTION.

{¶71} In his ninth assignment of error, Ross argues that cumulative errors in the proceeding deprived him of his constitutional rights to a fair trial. We disagree.

{¶72} Cumulative error exists only where the errors during trial actually "deprive[d] a defendant of the constitutional right to a fair trial." *State v. DeMarco*, 31 Ohio St.3d 191 (1987), paragraph two of the syllabus. "'[T]here can be no such thing as an error-free, perfect trial, and * * * the Constitution does not guarantee such a trial.'" *State v. Hill*, 75 Ohio St.3d 195, 212

(1996), quoting *United States v. Hasting*, 461 U.S. 499, 508-509 (1983). Moreover, "errors cannot become prejudicial by sheer weight of numbers." *Hill*, 75 Ohio St.3d at 212.

{¶73} After reviewing the record, we cannot say that his trial was plagued with numerous errors or that his constitutional right to a fair trial was violated. Therefore, Ross' ninth assignment of error is overruled.

III

{¶74} Ross' eighth and tenth assignments of error are sustained and his convictions are reversed so that the trial court may 1) apply *Johnson* in the first instance, and 2) sentence him in accordance with *Johnson* and *Pelfrey*. This Court declines to address Ross' second assignment of error as it is not yet ripe for review. His remaining assignments of error are overruled. The judgment of the Lorain County Court of Common Pleas is affirmed in part, reversed in part, and the cause is remanded for further proceedings consistent with the foregoing opinion.

Judgment affirmed in part,
reversed in part,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Lorain, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is

instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed equally to both parties.

BETH WHITMORE
FOR THE COURT

CARR, P. J.
DICKINSON, J.
CONCUR

APPEARANCES:

PAUL GRIFFIN, Attorney at Law, for Appellant.

DENNIS P. WILL, Prosecuting Attorney, and MARY R. SLANCZKA, Assistant Prosecuting Attorney, for Appellee.