[Cite as *State v. Simpson*, 2011-Ohio-2771.]

| | | | |
|---|---|---|---|
| STATE OF OHIO | ) | | IN THE COURT OF APPEALS |
| | )ss: | | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | | |

STATE OF OHIO

    Appellee

    v.

CHRISTOPHER B. SIMPSON

    Appellant

C.A. No.    25363

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR 09 03 0964 (A)

DECISION AND JOURNAL ENTRY

Dated: June 8, 2011

MOORE, Judge.

{¶1}    Appellant, Christopher B. Simpson, appeals the judgment of the Summit County Court of Common Pleas. This Court reverses.

I.

{¶2}    In the early hours of February 1, 2010, Patrick Sullivan was viciously attacked in his bedroom. Jen Mitchell owned the house at 1556 Tonawanda Ave. where she lived with her boyfriend, Justin, and the appellant, Christopher Simpson. Sullivan lived in the basement of the house.

{¶3}    The victim testified that in the afternoon of January 31, 2010, he had been playing with some "buckshot bombs," which were makeshift firecrackers that he had made. He claimed that because they had no "BBs," they could not detonate. Simpson was allegedly present at this time, but did not object to this activity. On the evening of January 31, 2010, Mitchell, Justin, Simpson, Simpson's girlfriend, Theresa, and Simpson's cousin, Andrew Hackney, were

"hanging out" and drinking beer at the house. At approximately 2:00 a.m. on February 1, 2010, the victim was alone in the basement playing computer games in his bedroom. He saw Simpson and Hackney come down the stairs with co-defendant Donald Frano and his friend Nicholas Moran. The victim knew Frano and Moran lived together on Schiller Street, along with Matt Olls. According to the victim, he knew Frano and Moran casually, but they were primarily friends of Simpson.

{¶4} The victim testified that Simpson was visibly angry and accused the victim of "trying to blow everyone up and kill everybody" with the buckshot bombs, and further accused the victim of taking one of his "Twiztid" charms. When the victim tried to explain things to Simpson, he hit the victim over the head with what appeared to be the handle of a cue stick. The victim fell back and "everything started to fade to black." He slumped back on the bed and saw Moran and Frano going through his possessions in search of the Twiztid charm or "for stuff to steal." Hackney picked up a gallon jug of urine and poured it over the victim, which brought him back to consciousness. The victim did not remember how it came to pass, but he ended up bent over while something was inserted into his rectum. He was unsure of who did this to him. After this was over, the victim stood up and attempted to urinate into a gallon jug, but was unable to do so, so he lay back down on the bed. He was subsequently awakened by Frano and Moran, who took him to City Hospital.

{¶5} The victim spent twelve days in the hospital, and was then transferred to a nursing home. He sustained multiple skull fractures, a broken nose, a torn rectum and perforated intestine, and several minor injuries. He wore a colostomy bag for four months while his rectal and intestinal injuries healed. While at the nursing home, the victim called home and spoke with

both Mitchell and Simpson. He claimed that Simpson seemed "a little bit foggy on the whole thing, himself."

{¶6} Moran testified that he and Frano received a call from Simpson around 2:00 a.m. on February 1, 2010, asking them to come over to help with something. When they arrived at the house at 3:00 a.m., Simpson, Theresa, Mitchell, Justin, and Hackney were at the residence. Simpson looked angry and agitated. He told them about the buckshot bombs and how the victim had thrown some outside, and even one in the house. After ten to fifteen minutes, Simpson stood up and said he was going downstairs to beat up the victim. Frano, Moran, and Hackney followed him to the basement.

{¶7} Simpson challenged the victim to a fight, but the victim did not want to engage in a fight. Simpson hit the victim in the head with a pool ball stuffed in a sock. Simpson lifted the victim to his feet and demanded that he fight. He pushed the victim toward Hackney, who started punching him in the face. Frano threw the victim back on the bed, and Simpson hit him again with the pool ball. Simpson told Hackney to pour the jug of urine on him, which he did. Simpson and Hackney continued to punch and kick the victim. Moran told Frano, who was no longer participating in the altercation, that they needed to get the victim to the hospital. While they were gathering up clothes for the victim, Moran heard Simpson say, "This one's for you, Don," and saw Simpson insert a mop or a broom stick into the victim's rectum.

{¶8} Moran testified that the entire event, from their arrival to their departure to the hospital, was approximately one hour and fifteen to thirty minutes. Simpson told Moran and Frano to take the victim to a bar, BG Breeze, so that it would look like someone had jumped him. Instead, they drove him to City Hospital. Moran testified that they dropped the victim off about thirty to forty feet from the emergency door because Moran was driving and was intoxicated and

afraid of getting in trouble. When Moran was first interviewed by Detective Bell, he claimed that he was not at the house when any of the events occurred. At trial, Moran denied any involvement in the rape or the felonious assault. He was not charged in the case.

{¶9} The victim arrived at the emergency room at approximately 7:00 a.m. During emergency intake, the victim was unable to provide any details about what happened to him, other than to say he was "beat up." Valorie Prulhiere, a registered nurse and coordinator of the Development Options for Violent Emergencies program interviewed the victim on February 5, 2010. The victim identified his assailants as "Nick, Don, and Matt [Olls]." He believed that they wanted to take his possessions. Prulhiere testified that in answering these questions the victim was clear, sure, and steady.

{¶10} Detective Bell interviewed the victim in the hospital on February 11, 2010. At that time, the victim recalled that Simpson, Frano, Moran and Hackney were in the basement. He told the detective that after being hit by "someone," he blacked out and did not remember anything that happened afterward. In addition, he told the detective that nothing should happen to Simpson because he did not do anything, and that Simpson never struck him. He reiterated that Simpson did nothing, and that Frano and Moran were the only assailants.

{¶11} Detective Bell interviewed Simpson on February 5, 2010. Simpson told the detective that he did not go into the basement that night, and that the victim was downstairs with the two others he only knew as the "Schiller boys." They had come over to the house with two thirty-packs of beer, and spent hours downstairs playing loud music. At one point, Simpson heard a "commotion" in the basement. He then saw the victim leave the house with Moran and Frano.

{¶12} Detective Bell obtained permission from Simpson to go down to the basement, where he saw that the floor was mopped clean, and emitted a strong odor of bleach. Simpson explained to Detective Bell that the basement floor was cleaned of the spilled urine because they anticipated an inspection of the house by the health department. The detective found several blood splatters on the basement wall near the victim's bed, and DNA tests showed that they were consistent with the victim's DNA.

{¶13} On April 16, 2009, Simpson was indicted by a grand jury on one count of rape in violation of 2907.02(A)(2), a felony of the first degree, one count of felonious assault in violation of R.C. 2903.11(A)(1)/(2), a felony of the second degree, and one count of tampering with evidence in violation of R.C. 2921.12(A)(1), a felony of the third degree. On April 30, 2009, Simpson entered a plea of not guilty and the matter proceeded to a jury trial on February 18, 2010. Co-defendant Frano entered a plea of guilty and testified against Simpson at trial. On February 23, 2010, the jury found Simpson guilty of felonious assault and tampering with the evidence. He was found not guilty of rape. On March 26, 2010, Simpson was sentenced to four years of incarceration for felonious assault, and one year of incarceration for tampering with evidence, ordered to run concurrently.

{¶14} Simpson timely filed a notice of appeal. He raises three assignments of error for our review.

II.

**ASSIGNMENT OF ERROR I**

"THE TRIAL COURT COMMITTED PLAIN ERROR IN ITS INSTRUCTION TO THE JURY ON COMPLICITY IN 1) GIVING AN ERRONEOUS INSTRUCTION AS TO WHAT CONDUCT CONSTITUTES COMPLICITY; 2) FAILING TO GIVE THE JURY THE REQUIRED CAUTIONARY INSTRUCTION REGARDING THE TESTIMONY OF AN ALLEGED ACCOMPLICE UNDER R.C.[]2923.03(D); AND 3) FAILING TO IDENTIFY

NICHOLAS MORAN AS A SECOND POTENTIAL ACCOMPLICE IN ITS INSTRUCTION."

{¶15} Simpson contends that the trial court committed plain error in its jury instructions because it failed to give the cautionary instruction regarding the testimony of an alleged accomplice required under R.C. 2923.03(D). We agree.

{¶16} Pursuant to Crim.R. 52(B), a plain error that affects a substantial right may be noticed by an appellate court despite not being brought to the attention of the trial court. However, notice of a plain error is taken with the utmost caution and only to prevent a manifest miscarriage of justice. *State v. Bray*, 9th Dist. No. 03CA008241, 2004-Ohio-1067, at ¶12. Therefore, we will not reverse the trial court decision unless it has been established that the trial court outcome would have clearly been different but for the alleged error. Id.

{¶17} When an accomplice testifies against a defendant, R.C. 2923.03(D) requires that the trial court instruct the jury as follows:

> "'The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> "It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.'"

{¶18} It is undisputed that the trial court failed to give the R.C. 2923.03(D) instruction. It is also undisputed that no objection was made by trial counsel to the absence of this instruction and that plain error is the appropriate standard. The parties disagree on the impact of the omission of the jury instruction. Simpson asserts that the failure of the trial court to include the cautionary instruction when it had an affirmative duty to do so was "clearly prejudicial" and "therefore substantially affected the outcome of the trial." The State asserts that the alleged

accomplice's testimony was corroborated and, therefore, the erroneous instruction was not plain error.

{¶19} When determining whether the trial court committed plain error by failing to comply with R.C. 2923.03(D), this Court examines several factors. *State v. Davis*, 9th Dist. No. 22395, 2005-Ohio-4083, at ¶16. First, we look at the scope of cross-examination of the accomplice that was permitted by the trial court. Id. Second, we review whether the details of the accomplice's plea agreement were presented to the jury. Id. Third, we examine whether the jury instructions given contain much of the substance mandated by R.C. 2923.03(D). Id. Finally, we look to whether the accomplice's testimony was favorable to the defendant, justifying the failure to request the instruction as a tactical decision. Id.

{¶20} Here, it appears defense counsel was given wide latitude during cross-examination of the accomplice, Frano. Defense counsel questioned portions of Frano's testimony that were inconsistent with that of the victim and Moran. He also questioned whether Frano was fabricating the events or if he had discussed the events with Moran. He further questioned how Frano was aware of events that had occurred outside of his presence. This Court previously determined, in *Davis*, that the appellant was not given wide latitude during cross-examination because on repeated occasions, the State's objections were sustained when defense counsel attempted to attack the accomplice's credibility. *Davis* at ¶17. Here, however, defense counsel had sufficient opportunity to cross-examine Frano.

{¶21} In addition, the details of Frano's plea agreement were presented to the jury. The State began its direct examination by addressing the fact that Frano was also charged in the case with felonious assault and rape. Frano explained that he pled guilty to one count of felonious assault and the rape charge was dismissed in exchange for his testimony against Simpson. There

was no agreement reached as to the terms of Frano's sentence and, on the date of the trial, he had not yet been sentenced.

{¶22} In its instruction, the trial court gave the following instruction regarding Frano's testimony:

> "You have heard testimony from Donald Frano II, another person who pleaded guilty to a portion of the crimes charged in this case and is said to be an accomplice. An accomplice is one who knowingly joins another in the commission of a crime. Whether Donald Frano II was an accomplice and the weight to give his testimony are matters for you to determine."

{¶23} The trial court previously gave the following instruction regarding credibility:

> "To weigh the evidence, you must consider the credibility of the witnesses. You will apply the tests of truthfulness which you apply in your daily lives.

> "These tests include the appearance of each witness upon the stand; his/her manner of testifying; the reasonableness of the testimony; the opportunity he/she had to see, hear and know the things concerning which he/she testified; his/her accuracy of memory; frankness or lack of it; intelligence; interest and bias, if any; together with all the facts and circumstances surrounding the testimony. Applying these tests, you will assign to the testimony of each witness such weight as you deem proper.

> "You are not required to believe the testimony of any witness simply because he or she was under oath. You may believe or disbelieve all or any part of the testimony of any witness. It is your province to determine what testimony is worthy of belief and what testimony is not worthy of belief."

{¶24} The parties agree that the jury instructions did not contain the required warning that the accomplice's testimony be viewed with "grave suspicion" and "great caution." R.C. 2923.03(D). Rather, the jury was instructed to consider Frano's credibility in the identical manner it judged the testimony of all other witnesses.

{¶25} Finally, as in *Davis*, the testimony offered by Frano is distinguishable from the testimony in *Wynn* and *Banaag* because the testimony cannot be viewed as favorable to Simpson. *Davis* at ¶20; *State v. Wynn* (Apr. 28, 1999), 9th Dist. No. 97CA006968; *State v. Banaag* (Jan. 26, 2000), 9th Dist. No. 98CA0033.

{¶26} Frano testified that Simpson called him at 2:00 a.m. on the day in question and offered Frano a bag of weed to come over and help him with something. Simpson was apparently upset with the victim, and Frano suspected that he was going to watch the two fight. Frano testified that he was intoxicated and had been smoking marijuana. Frano went downstairs to the victim's room with Simpson, Moran and Simpson's cousin, Hackney. At Simpson's command, and because he was scared of Simpson, Frano kicked the victim in the shoulder. After this, Frano stepped back and observed Simpson beating the victim "with an 8-ball in a sock." After striking him several times, Simpson stood the victim up to fight Hackney, who struck him several more times. At this point, the victim was unconscious on the floor. Simpson and Hackney began dragging the victim around on the floor, breaking his belongings, and pouring urine on the victim.

{¶27} Frano further testified that the victim's clothes were torn, so he began looking for clothes to dress him and take him to the hospital. While doing so, he observed Simpson pull a broomstick out of the victim's anus. Simpson then said, "This one's for you, Don." This was apparently in reference to a practical joke played on Frano in which someone had "stuck a beer bottle in between [his] butt cheeks and took a picture" of it. Frano and Moran helped the victim get dressed and put him in Frano's car. Simpson told the two to drop him off in front of a bar so that it would look like he had been jumped. Instead, Frano and Moran dropped the victim off in front of the hospital.

{¶28} While the victim did testify at trial regarding the events in question, on two previous occasions he told both the detective and hospital personnel that Moran and Frano were responsible for the attack and that Simpson was not involved. As such, there was not sufficient corroborative evidence to support Simpson's conviction. Without the required jury instruction, a

failure to properly weigh the accomplice's testimony would have a significant impact in assessing Simpson's guilt. See *State v. Crawford*, 10th Dist. No. 01AP-1428, 2003-Ohio-1447. Accordingly, we find plain error in the trial court's failure to give the mandatory jury instruction on accomplice testimony under R.C. 2923.03(D). Simpson's first assignment of error is sustained.

## ASSIGNMENT OF ERROR II

"[] SIMPSON WAS RENDERED INEFFECTIVE ASSISTANCE OF DEFENSE COUNSEL AT TRIAL."

## ASSIGNMENT OF ERROR III

"[SIMPSON'S] CONVICTIONS FOR FELONIOUS ASSAULT AND TAMPERING WITH EVIDENCE WERE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE."

{¶29} Given this Court's resolution of Simpson's first assignment of error, Simpson's remaining assignments of error are moot, and this Court declines to address them. See App.R. 12(A)(1)(c).

### III.

{¶30} Simpson's first assignment of error is sustained. Simpson's remaining assignments of error are rendered moot and we decline to address them. The judgment of the Summit County Court of Common Pleas is reversed and the cause remanded for further proceedings consistent with this opinion.

Judgment reversed,
and cause remanded.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellee.

_____
CARLA MOORE
FOR THE COURT

DICKINSON, J.
BELFANCE, P. J.
CONCUR


APPEARANCES:

NICHOLAS SWYRYDENKO, Attorney at Law, for Appellant.

SHERRI BEVAN WALSH, Prosecuting Attorney, and RICHARD S. KASAY, Assistant Prosecuting Attorney, for Appellee.