[Cite as *State v. Brownlee*, 2018-Ohio-739.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 105116**

# STATE OF OHIO

PLAINTIFF-APPELLEE

vs.

# EDDIE BROWNLEE

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED IN PART, REVERSED IN PART,
AND REMANDED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-16-604052-A

**BEFORE:** Stewart, P.J., Blackmon, J., and Jones, J.

**RELEASED AND JOURNALIZED:** March 1, 2018

**ATTORNEY FOR APPELLANT**

Rick L. Ferrara
Rick L. Ferrara, Esq.
2077 East 4th Street, 2d Floor
Cleveland, OH 44114


**ATTORNEYS FOR APPELLEE**

Michael C. O'Malley
Cuyahoga County Prosecutor

Anna M. Faraglia
Assistant County Prosecutor
Justice Center, 9th Floor
1200 Ontario Street
Cleveland, OH 44113

MELODY J. STEWART, P.J.:

**{¶1}** When defendant-appellant Eddie Brownlee, discovered that the 64 year-old victim (one of his drug customers) had become an informant for the state and participated in a controlled drug buy that led to Brownlee's arrest, he ordered three of his associates to "f*** him up." The associates went to the victim's apartment and, using Brownlee's gun, shot and killed the victim. The associates made plea deals with the state, and testified against Brownlee. A jury found Brownlee guilty of aggravated murder, murder, felonious assault, aggravated burglary, and kidnapping. The court ordered Brownlee to serve a 33-year sentence prior to a sentence of life without the possibility of parole.

## I. Sufficiency of the Evidence

**{¶2}** Because it is potentially dispositive, we begin with Brownlee's seventh assignment of error and his claim that there was insufficient evidence to prove aggravated murder, murder, or conspiracy to commit murder. He argues that he only ordered his associates to beat up the victim, not kill him, so the victim's murder was not a foreseeable consequence of his actions. He also argues that his order to beat up the victim meant that he did not have the requisite mental state to purposely cause the victim's death.

**{¶3}** We determine whether the evidence is legally sufficient to sustain a conviction by viewing the evidence in a light most favorable to the prosecution, and deciding whether any rational trier of fact could have found the essential elements of the

crime proven beyond a reasonable doubt. *State v. Monroe*, 105 Ohio St.3d 384, 2005-Ohio-2282, 827 N.E.2d 285, ¶ 47.

{¶4} The evidence showed that after receiving complaints about drug-dealing, the police made three controlled drug buys from the victim. The victim was arrested and agreed to cooperate in a buy-bust operation against Brownlee, his drug supplier. The victim and his girlfriend made three controlled drug buys from Brownlee and Brownlee's girlfriend, codefendant Sheila McFarland. The police arrested Brownlee and McFarland after the third controlled drug buy.

{¶5} In a phone call he made while being held in jail, Brownlee told one of his associates, Ryan Motley, that he suspected that the victim had betrayed him. He said that he would be released from jail shortly and, with respect to the victim, that "we gonna handle it." Motley then went to a hotel room where Brownlee had been staying and took a gun belonging to Brownlee. In another telephone conversation, Brownlee told Motley to "[g]et those motherf***ers" and to "handle it." After Brownlee had been released from jail, he and Motley met at Brownlee's hotel room. Motley testified that Brownlee wanted him to "f*** up" the victim. At some earlier point in time, Motley had given the gun he took from Brownlee's hotel room to Brownlee's brother, but after meeting with Brownlee at the hotel room, Motley retrieved the gun from Brownlee's brother.

{¶6} The victim's girlfriend said that on the night before the victim's murder, she overheard a call Brownlee made to the victim. Brownlee said that both the victim and the girlfriend "are gonna see our graves." She testified that not long after that call ended,

the victim told her that a black truck with four men pulled up in front of their apartment. The men, one of whom was Brownlee, exited the truck and pointedly stood by the truck watching their apartment. When the victim told the men that he was calling the police, they left. The police arrived quickly and advised the victim and the girlfriend to stay somewhere else that night. They left the apartment, but they decided to return just a few hours later.

{¶7} More threatening calls followed. Motley testified that he recruited two others and drove to the victim's apartment building. Armed with Brownlee's gun and wearing a mask and gloves, Motley and his associates waited in a stairwell for the victim to leave his apartment. When the victim left the apartment, Motley pulled out the gun and "bum-rushed" the victim. According to Motley, the victim started "running towards me." Motley testified that he "squeezed the gun to make sure [the victim] doesn't take it from me and it went off." From inside the apartment, the girlfriend heard the victim say, "somebody help me" and then heard a gunshot. The victim had been shot in the chest.

{¶8} Motley and his companions fled the building. He called Brownlee and said, "it's done." On orders from Brownlee, he threw the gun into an abandoned car. Later that evening, Motley went to Brownlee's hotel room and told him that "I made a mistake and shot him." Brownlee replied, "it's gonna be all right. And hate to see him go like that, but what's done is done." Brownlee gave Motley cocaine with a street value of $2,800 in drugs as payment.

**{¶9}** Brownlee first argues that the evidence showed only that he asked Motley to beat the victim, not kill him. He claims that Motley's independent decision to carry a gun to the victim's apartment broke the chain of causation necessary to show that Brownlee conspired to commit murder.

**{¶10}** To prove that Brownlee was part of a conspiracy, the state had to show that he acted with purpose to commit or promote or facilitate an aggravated murder and planned or aided in the commission of the offense or agreed with Motley that one or more of them would engage in conduct that facilitates the offense. *See* R.C. 2923.01(A).

**{¶11}** The evidence showed that Brownlee told Motley that he would "get those motherf***ers" and that he wanted Motley to "f*** up" the victim in retaliation for cooperating with the police. These conversations set into motion a chain of events that caused Motley to retrieve Brownlee's gun and then use it to kill the victim. These events all naturally flowed from Brownlee's own threat that the victim would see his "grave" as a result of cooperating with the police — a clear allusion to the victim's death. A rational trier of fact could have found that the state established the elements of a conspiracy.

**{¶12}** The same evidence refutes Brownlee's argument that he did not act with purpose to kill the victim, but only with an intent to injure. One conspirator is criminally liable for the acts of a coconspirators done in furtherance of the conspiracy and reasonably foreseeable as a necessary or natural consequence of the conspiracy. *State v. Robinson*, 98 Ohio App.3d 560, 574, 649 N.E.2d 18 (8th Dist.1994); *State v. Chambers*,

53 Ohio App.2d 266, 272, 373 N.E.2d 393 (9th Dist.1977). On this basis alone, the murder was a natural consequence of the conspiracy that sought, by Brownlee's own threat, to put the victim in his grave.

{¶13} And even if the evidence did not so strongly indicate that the object of the conspiracy was to kill the victim, Motley's testimony that he "accidentally" fired the gun did not absolve Brownlee. Motley testified that he pleaded guilty to "purposeful murder" for his part in the conspiracy. That was an admission that he acted purposely to kill the victim; it was evidence that the jury could view as establishing the true intent of the conspiracy. The firing of the gun was an act of a co-conspirator that did not constitute an independent intervening cause that freed Brownlee of responsibility for the victim's death. *State v. Jefferson*, 2d Dist. Montgomery No. 15828, 1997 Ohio App. LEXIS 887, 22 (Mar. 14, 1997).

## II. Trial Errors

### A. Jury Instructions

{¶14} Brownlee argues that the court failed to instruct the jury that testimony by Motley and his two associates should be considered with grave suspicion in light of their guilty pleas. He concedes that defense counsel did not request the instruction, but maintains that the court's failure to give the instruction amounted to plain error.

{¶15} If an alleged accomplice of the defendant testifies against the defendant in a case where the defendant is charged with complicity in committing an offense, the court must give substantially the following instruction:

> The testimony of an accomplice does not become inadmissible because of his complicity, moral turpitude, or self-interest, but the admitted or claimed complicity of a witness may affect his credibility and make his testimony subject to grave suspicion, and require that it be weighed with great caution.
>
> It is for you, as jurors, in the light of all the facts presented to you from the witness stand, to evaluate such testimony and to determine its quality and worth or its lack of quality and worth.

R.C. 2923.03(D).

{¶16} Although R.C. 2923.03(D) uses the mandatory word "shall" with respect to the trial judge's obligation to give the accomplice instruction, the failure to object if the trial judge does not give the instruction forfeits all but plain error. *State v. Perez*, 124 Ohio St.3d 122, 2009-Ohio-6179, 920 N.E.2d 104, ¶ 131; *State v. Yarbrough*, 104 Ohio St.3d 1, 2004-Ohio-6087, 817 N.E.2d 845, ¶ 77. Plain error exists only if "the outcome of the trial clearly would have been otherwise." *State v. Long*, 53 Ohio St.2d 91, 93, 372 N.E.2d 804 (1978), paragraph two of the syllabus. *See also* Crim.R. 52(B).

{¶17} Brownlee claims that his case depended on attacking Motley's credibility on the basis that Motley, as the person who actually shot the victim, changed his story in order to get a good plea deal from the state. The argument about Motley changing his version of facts goes only so far — the recorded telephone conversations, which were not subject to being changed for convenience, were compelling evidence of a conspiracy to murder the victim for turning informant against Brownlee. These conversations, viewed along with statements by the victim's girlfriend, proved the existence of a conspiracy to murder the victim apart from Motley's own testimony.

**{¶18}** Brownlee cites *State v. Simpson*, 9th Dist. Summit No. 25363, 2011-Ohio-2771, as authority for the proposition that the court's failure to give the R.C. 2923.03(D) accomplice instruction is plain error. It is more accurate, however, to say under the facts of that case that the failure to give the instruction was plain error because the accomplice's testimony widely differed from statements he gave the police and there was a lack of corroborating evidence. *Id*. at ¶ 29. In this case, we cannot clearly say that giving the accomplice instruction would have altered the outcome of trial. The jury knew the terms of Motley's plea deal (he would receive 18 years to life in prison). He was subject to extensive cross-examination and defense counsel spent a considerable amount of time in closing argument challenging Motley's credibility. In addition, the court instructed the jury to "consider the interest or bias the witness has in the outcome of the verdict * * *." That instruction, while admittedly not as specific as an accomplice instruction, nonetheless provided an avenue for the jury to assess Motley's credibility. Given these circumstances, we think it unlikely that an instruction that the jury view Motley's credibility with grave suspicion could have changed how the jury viewed his testimony.

**{¶19}** This conclusion segues into Brownlee's argument that trial counsel were ineffective for failing to request an accomplice instruction.

**{¶20}** A defendant claiming ineffective assistance of counsel must show that trial counsel was deficient for failing to raise the issues he presents on appeal and that there was a reasonable probability of success had those issues been presented at trial.

*Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Our review of trial counsel's performance is highly deferential and we refrain from second-guessing tactical decisions of trial counsel. *State v. Hand*, 107 Ohio St.3d 378, 2006-Ohio-18, 840 N.E.2d 151, ¶ 231.

{¶21} There may have been a tactical reason why defense counsel did not ask for an accomplice instruction: Motley gave testimony that defense counsel wanted the jury to believe — that the gun fired accidentally. In fact, one of Motley's associates testified that immediately after the shooting, Motley "just kept telling me he didn't mean to do it. And God knew his heart." Defense counsel specifically cited this testimony in closing argument to show that Brownlee did not intend that Motley kill the victim: "Ryan says it wasn't supposed to happen that way, it was an accident." An accomplice instruction would have been a double-edged sword for the defense because the instruction would have put it in the uncomfortable position of having the court instruct the jury that Motley's testimony be viewed with grave suspicion, thus undermining its claim that some part of Motley's testimony was credible. *State v. Tucker*, 8th Dist. Cuyahoga No. 88231, 2007-Ohio-1710, ¶ 24; *State v. Flowers*, 9th Dist. Medina No. 2564-M, 1997 Ohio App. LEXIS 642, 11-12 (Feb. 26, 1997). Because there was a plausible basis for defense counsel choosing not to seek the accomplice instruction, defense counsel did not violate an essential duty to Brownlee. *Strickland* at 690-691 ("strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable."). The ineffective assistance of counsel claim fails.

## B. Exhibits

**{¶22}** Defense Exhibit E was a 90-minute long recording of a proffer made by Motley as part of his guilty plea. At trial, the defense played a 10-15 second excerpt of that proffer to the jury in which Motley stated that Brownlee did not know that he took the gun from the hotel room. The court admitted the entire exhibit into evidence over the state's objection. After the jury announced that it had reached a verdict, but before that verdict had been announced, defense counsel informed the court that Exhibit E had not been given to the jury and asked for a mistrial on that basis. The court denied the motion for three reasons: (1) it was unlikely that the jury would have listened to the entire recording; (2) defense counsel did not call the error to the court's attention in a timely manner; and (3) ordering the jury to redeliberate on the basis of 10-15 seconds of evidence might cause it to believe that the court wanted the jury to place additional emphasis to the exhibit.

**{¶23}** A mistrial can be declared only when the ends of justice require it and a fair trial is no longer possible. *State v. Franklin*, 62 Ohio St.3d 118, 127, 580 N.E.2d 1 (1991). We review the decisions regarding mistrials for an abuse of discretion. *State v. Garner*, 74 Ohio St.3d 49, 59, 656 N.E.2d 623 (1995).

**{¶24}** It appears that defense counsel was not in physical possession of the recording when they asked the court to admit it into evidence. During the discussion on the motion for a mistrial, one of the defense attorneys told the court that after trial commenced, the recording had been made available to the defense through the discovery

portal (presumably as a digital file) and that an assistant prosecuting attorney would "put it on disk." The process of putting the recording on disk continued during and after closing arguments. The record suggests that the disk was not completed until after the jury announced that it had reached a verdict. The court seemed unaware that at the time it admitted the exhibit into evidence, the evidence did not exist in nondigital form.

{¶25} These facts show that Motley invited the error of which he now complains. The invited error doctrine states that a party cannot take advantage of an error that the party induced the trial court make. *See State v. Smith*, 148 Ohio App.3d 274, 2002-Ohio-3114, 772 N.E.2d 1225, ¶ 30 (8th Dist.). Defense counsel knew when the jury would begin deliberations: the court adjourned on a Friday, telling the jury that it would begin its deliberations the following Monday, at which time it would receive "all of the exhibits." Despite having a weekend in which to ensure that the interview be copied to a disk, that task had not been accomplished. After the jury announced that it had reached a verdict, one of the defense attorneys told the court that he and an assistant prosecuting attorney "agreed to meet this morning in order to try to make sure that we had all the exhibits together" and that "were going to try to and get a disk together in order to present it to the jury * * *." That the parties did not accomplish this task in time to get the exhibit to the jury occurred by no error from the court. And there is nothing in the record to show that defense counsel informed the court that the exhibit was not ready.

{¶26} Brownlee next argues that defense counsel's failure to ensure that the jury received the exhibit was a violation of counsel's essential duty to him and he was denied the effective assistance of counsel.

{¶27} The ineffective assistance of counsel claim fails because Brownlee suffered no material prejudice from the omission of the exhibit. *See State v. Kadri*, 5th Dist. Tuscarawas No. CA-86AP070050, 1986 Ohio App. LEXIS 9588, 3 (Dec. 24, 1986) (when properly admitted exhibits are not given to the jury for its deliberations, grounds for reversal exist only if the defendant has suffered material prejudice). Apart from the 10-15 second excerpt of the recording stating that Brownlee did not know that Motley had the gun when he went to the victim's apartment, Brownlee makes no argument that there was any other exculpatory material on the recording. And apart from the failure to show prejudice, Brownlee concedes that the recording "was central to the State's case as well * * *." Appellant's brief at 21. If the exhibit could work both to his benefit and detriment, there is no basis for finding that the outcome of trial would have been different had the missing exhibit been considered by the jury.

### C. Prejudicial Remarks

{¶28} After the close of testimony, defense counsel told the court that "my client and co-counsel came to understand that you may have indicated that, you know, at this point we're just throwing Hail Marys up." Brownlee argues that the court should have declared a mistrial as a result of making this remark or, at a minimum, held a hearing on the matter.

**{¶29}** The record does not actually show that the court made the alleged remark. Other persons supposedly overheard the remark and informed defense counsel; hence, defense counsel's care in stating that co-counsel "came to understand" that the remark had been made. If the remark is not on the record, Brownlee cannot exemplify any error. *State v. Bartlett*, 8th Dist. Cuyahoga No. 100769, 2014-Ohio-4379, ¶ 11, citing App.R. 12(A)(1)(b) and App.R. 16(A)(7). In addition, defense counsel was equivocal on whether the court actually made any remark. He stated that "I just don't think it's an appropriate comment *if it were made* in the presence of the jury." (Emphasis added.). The qualifying language "if it were made" does not prove that any disparaging remark had been made and, more importantly, that it had been made in the presence of the jury. The court did not err by summarily denying Brownlee's motion for a mistrial.

**{¶30}** Brownlee also claims that the court erred by telling the jury that it would assess the credibility of both Motley and his associate to determine whether they were testifying "truthfully" for purposes of their plea bargains.

**{¶31}** While it is true that assessments of witness credibility are primarily to be made by the trier of fact, *State v. Treesh*, 90 Ohio St.3d 460, 472, 2001-Ohio-4, 739 N.E.2d 749, the court did not violate this rule. Read in context, the court's remarks informed the jury that Motley and his associates agreed that as part of their plea deals, they would testify truthfully against Brownlee and that the judge would determine, for purposes of compliance with the plea deals, whether they had been truthful in so testifying. This was allowable. *See State v. Cornwell*, 86 Ohio St.3d 560, 571,

1999-Ohio-125, 715 N.E.2d 1144 (questions on "truthful-testimony" clause in a plea agreement were not improper and did not prejudicially affect substantial rights). At no point did the court usurp the jury's fact-finding role in this case. The court made this clear when it instructed the jury that whether it believed a witness or not "is up to you."

## D. Continuance

{¶32} Days before the start of trial, Motley and two other codefendants agreed to plead guilty. Motley agreed to plead guilty the day before Brownlee's trial commenced. The terms of his plea deal required him to testify against Brownlee, and before accepting the guilty plea, he made a proffer of the testimony he would give against Brownlee. Defense counsel asked the court to continue the trial on grounds that Motley's proffer changed the whole manner in which they had prepared the case because they assumed that Brownlee and Motley would be tried together and that co-conspirator statements would be inadmissible under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968) (holding that a defendant's confrontation rights are violated when a nontestifying codefendant's confession naming the defendant as a participant in the crime is introduced at a joint trial). The court denied the motion, noting that recordings of telephone conversations involving Brownlee and Motley had been available to the defense in advance of trial, so it would not have been surprised by the substance of Motley's testimony.

{¶33} We review a decisions to grant or deny continuances of trial for an abuse of discretion, taking into account factors such as the length of the delay requested, whether

prior continuances had been granted, the inconvenience resulting from continuing trial, and the reasons for the delay. *State v. Conway*, 108 Ohio St.3d 214, 2006-Ohio-791, 842 N.E.2d 996, ¶ 147, citing *State v. Landrum*, 53 Ohio St.3d 107, 115, 559 N.E.2d 710 (1990).

{¶34} The record refutes any contention that Brownlee was surprised by the substance of Motley's proffer. Count 3 of the indictment charged Brownlee with conspiracy to commit aggravated murder, alleging that Brownlee solicited Motley to murder the victim and provided him with a firearm. The state intended to prove the conspiracy with recorded telephone conversations that Brownlee had with Motley while being held in jail on the drug charges. These conversations were so incriminating that Brownlee filed a supplemental motion to sever his trial from that of Motley because "[i]t is apparent that Ryan Motley will incriminate Defendant Brownlee by his testimony and vice-versa."

{¶35} Brownlee maintains that it was not enough that he knew there was a *possibility* that Motley's statements could be used at trial — he claims that the actual statements were not an expected part of trial and were not shared until the day of trial. This is sophistry. The defense had access to the recorded telephone conversations and prepared for trial accordingly. Even the court noted that the conspiracy case against Brownlee rested primarily on the statements Brownlee made in the recorded telephone conversations:

> The first day that I heard the State's theory of the case in chambers with defense counsel present, I've been told that Brownlee was on the phone

soliciting someone to — to take care of, get [the victim] and that he did it through Sheila McFarland who called someone and said: Get the hammer.

In addition, the court noted that "[i]t's no surprise that Ryan's going to testify against Eddie. As a matter of fact, we have this issue with the motion for severance on the issue with the *Bruton* problem. So there's no great surprise here."

**{¶36}** We note that in addition to the court's remarks, the motion to continue trial had been made on the day that jury selection was to commence. The court knew that trial would be lengthy (the state ultimately called 25 witnesses), and noted that it had worked to clear its schedule. The judge told defense counsel that "if I continue this case, then all the work we've done to get to this point is really, we're starting all over again and I don't want to do that." This was a legitimate reason for denying the motion to continue trial. *State v. Hibbler*, 2d Dist. Clark No. 2001-CA-43, 2002-Ohio-4464, ¶ 10. The court did not abuse its discretion by denying the motion for a continuance.

### III. Weight of the Evidence

**{¶37}** Brownlee argues that his conviction for murder was against the manifest weight of the evidence because surveillance video of the shooting showed that Motley did not approach the victim with the purpose to kill him, but that the gun went off accidentally. This conclusion, Brownlee argues, is consistent with Motley's testimony that he was there only to rough up the victim.

**{¶38}** What the surveillance video shows is not as clear-cut as Brownlee claims. The video shows the victim walking down a hall and turning as Motley and one his associates enter the hallway from the stairwell. Motley admitted he had pulled out the

gun before approaching the victim, and the video shows the victim reaching for it. The two men scuffle for a few seconds, and then the victim falls to the ground.

{¶39} The quality of the video is not fine enough that we can say that it proves the gun accidentally fired and that the jury lost its way and created such a manifest miscarriage of justice by finding Motley acted purposefully. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 1997-Ohio-52, 678 N.E.2d 541. The scuffle between Motley and the victim does not rule out purposeful conduct. And because we cannot view the video as conclusive evidence that Motley did not act with purpose to kill, we cannot find that a guilty finding on aggravated murder is against the manifest weight of the evidence.

{¶40} In addition, the jury had competent, credible evidence to support the inference that Motley acted with purpose to kill. Recorded conversations showed that Brownlee wanted to "f*** up" the victim for being an informant for the police. In the same conversation, Brownlee mentioned his gun. Consistent with that sentiment, Brownlee told the victim and his girlfriend that they were "gonna see your graves." Brownlee knew that Motley was in possession of his gun. Motley then went to the victim's apartment building and waited for him. Peepholes in adjacent apartment doors had been taped and the DNA from one of Motley's associates was found on the tape. Despite claiming that he did not tell Motley to kill the victim, Brownlee displayed a cavalier attitude to the victim's death ("what's done is done") and paid Motley in drugs. All of this evidence could persuade the jury that Motley did not accidently kill the victim. The verdicts were not against the manifest weight of the evidence.

IV. Sentencing Issues

{¶41} The court imposed separate sentences for the kidnapping and aggravated murder counts (the two murder counts were merged into the aggravated murder count for sentencing). Brownlee argues that kidnapping and aggravated murder were allied offenses of similar import under R.C. 2941.25(A) and should have merged for sentencing. The state concedes that the offenses should have merged for sentencing, but argues that any error is harmless because Brownlee received a sentence of life without the possibility of parole on the aggravated murder count. It urges us to exercise our authority to modify the sentence without the need for a resentencing.

{¶42} We accept the state's concession that the kidnapping count and aggravated murder count should have merged for sentencing. We do not, however, agree that the error is harmless. "[I]mposing separate sentences for allied offenses of similar import is contrary to law and such sentences are void." *State v. Williams*, 148 Ohio St.3d 403, 2016-Ohio-7658, 71 N.E.3d 234, ¶ 2. The remedy is to remand for the state to elect which count it desires to proceed with for sentencing. *State v. Whitfield*, 124 Ohio St.3d 319, 2010-Ohio-2, 922 N.E.2d 182, ¶ 21.

{¶43} We acknowledge that the state's suggestion that we invoke our authority under R.C. 2953.08(G)(2) to merge the kidnapping count into the aggravated murder count could be viewed as a de facto selection. This would be a sensible approach, but unfortunately, it is not an approach that can be utilized under existing precedent. In *Williams*, the Supreme Court modified an appellate judgment and vacated sentences

imposed for allied offenses without the need for resentencing. But it found "no need to remand for resentencing, because at the sentencing hearing, the state elected to have Williams sentenced on aggravated murder as charged in count three, and the trial court had no discretion to impose separate sentences on counts one and two." *Id*. at ¶ 32. The state made no such election in this case, so we are constrained to find that the election should be made in the first instance below.

{¶44} Brownlee next argues that the court erred by vindictively imposing maximum, consecutive sentences and the maximum amount of fines against him because he refused to enter into a plea bargain with the state.

{¶45} There is no presumption of vindictiveness when the court imposes a sentence that is harsher than the one offered and rejected during plea negotiations. *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 16. We review the entire record to determine whether there is evidence of "actual" vindictiveness and can reverse only if we clearly and convincingly find the sentence is contrary to law because it was imposed as a result of actual vindictiveness. *Id*. at ¶ 19.

{¶46} When informed by the state that Brownlee rejected a plea offer and had no further interest in plea negotiations, the court asked, "[i]s that correct even if we bring Sheila [McFarland] into the mix?" The court noted that McFarland had been charged with aggravated murder and asked Brownlee, "[i]f the State were willing to offer her a plea and the Court were willing to tell you what she would get, would that change your mind?" The court then noted Brownlee's position that McFarland's involvement in the

case had arguably been "minimal" and "if the State is willing to offer her an acceptable plea bargain would that influence your decision?" Brownlee noted that the plea deal offered by the state — 23 years to life in prison — amounted to a life sentence for a person his age (he was 48 years old) and that if imposed, the 23-year sentence would not be functionally shorter than if he went to trial, was found guilty, and given a prison term with a life tail. The court replied, "If you said to me, hey, Judge, I will cop but I want Sheila to catch a break, I don't want a tail, I can see if I can make it happen. But if you just want to roll the dice, that's okay."

{¶47} On the day that Motley agreed to plead guilty and testify against Brownlee, the court stated that "I'm hoping we don't have to try it tomorrow, I'm hoping Eddie will do the right thing." The state informed the court that it would offer McFarland a deal where she would plead guilty to a first-degree felony count of conspiracy and that Brownlee had been offered 20 to 25 years of "flat" time, with 20 years at a minimum and an additional 5 more years at the court's discretion. The court then said, "Mr. Brownlee, the question now comes to you. You've seen the way this thing has come down, you've seen the way the process works. Is it necessary to take this thing to a trial?" Brownlee replied, "I'm an innocent man, so I guess so * * *." The court later said, "Mr. Brownlee, you should think about what it is you're doing." After the state recited the contents of jailhouse recordings between Brownlee, McFarland, and Motley, the court stated:

> I was saying, if you want to take the case to trial with that kind of evidence, you can do that and we're going to do it tomorrow. I'll note this Defendant's objection.

And I understand there's always a dynamic that drives things; right? And if you're Brownlee's age, 48, and you're going down for 20 years, sometimes street cred in the institution is more important than getting five, or six, or ten years off the sentence because you don't expect to live through it anyways.

So for whatever reason you want to go to trial, I will see to it that you have a fair trial starting tomorrow morning at 9:30 a.m. Thank you all, very much.

**{¶48}** The following day, the trial judge told Brownlee that he had been having dinner with friends:

I'm telling them what I'm doing for a living, you know, been dealing with a lot of murder cases. And I got to talking about this murder case, right. I said, most unusual thing, that Eddie Brownlee and he convinced the younger guy to plea, do the right thing, maybe save his life, and not do life in prison. I thought that was sort of interesting. Now Eddie's going to go to trial.

So my two friends said: Why is Eddie Brownlee going to trial? What's the motivation there?

**{¶49}** Brownlee said he was going to trial "[s]o the truth will come out." The court referenced the damning nature of the jail recordings and said, "I'm just saying." The judge told Brownlee that, "[i]f you stand before me convicted of these charges with your record, you know what's going to happen." When Brownlee continued to insist that the evidence would not show his guilt, the court replied, "If you think you could walk out of this courtroom with a not guilty on all 21 counts, I'll tell you what, go buy a lottery ticket too." The court went on to say, "Eddie, you've got to change your attitude or you're going to have a lifetime to think about it. I'm just going to lay my cards on the table. I'm not pressuring you. If you want a trial, you'll get the fairest possible trial."

**{¶50}** After Brownlee was found guilty, in a contentious sentencing the court stated to Brownlee:

> So anyway, before the crime, you're a very difficult, dysfunctional person under indictment instead of you copping a plea, getting a little time and put back on probation, rehabilitating yourself, cleaning up your act, stop selling drugs, stop using drugs. You don't decide to do that.

When Brownlee continued to insist that he did not order Motley to kill the victim, the court replied, "[t]hey could try your case until you're dead and you'd never get a not guilty."

**{¶51}** This record shows that the court pushed hard for a plea bargain and was annoyed that Brownlee refused to accept one. Viewed in isolation, the consecutive, maximum sentences might be viewed as vindictive. But the court's comments cannot be read in isolation from other remarks it made at sentencing, particularly that the murder occurred namely to thwart Brownlee's prosecution for drug trafficking:

> So the Court has handed down the harshest possible sentence consecutive [sic] and here is why. This crime was committed not only while this defendant was awaiting a trial, but he was housed in the county jail and used the auspices of the county jail and the communication system within the county jail to set up a murder. He set up a murder of a witness for the State of Ohio. He attacked the administration of justice and, therefore, the harm here is so great and unusual that not only does not a single term adequately reflect the seriousness of the defendant's conduct, but I think it's incumbent upon the trial court judge when witnesses are being killed by defendants that the harshest possible sentence be handed down so that anyone in a similar situation will never dream of getting on the phone in the county jail to set up a murder.

**{¶52}** Had the court said nothing about the plea, the murder of a police informant for the purpose of avoiding a drug trafficking prosecution would, by itself, justify a

maximum sentence in this case. *State v. Turner*, 105 Ohio St.3d 331, 2005-Ohio-1938, 826 N.E.2d 266, ¶ 101. ("We have approved death sentences in cases where the witness-murder specification was present alone or in combination with one other specification, even when substantial mitigation existed."); *State v. White*, 85 Ohio St.3d 433, 1999-Ohio-281, 709 N.E.2d 140; *State v. Coleman*, 85 Ohio St.3d 129, 145, 1999-Ohio-258, 707 N.E.2d 476 (affirming death penalty on ground that defendant deliberately executed a witness in order to escape prosecution). We cannot clearly and convincingly conclude that Brownlee's sentence was the product of actual vindictiveness for his refusing to accept the state's plea offer.

**{¶53}** Judgment affirmed in part, reversed in part, and remanded for resentencing.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MELODY J. STEWART, PRESIDING JUDGE

PATRICIA ANN BLACKMON, J., and
LARRY A. JONES, SR., J., CONCUR